[No. S102530. Nov. 7, 2002.]

MICHAEL EDELSTEIN et al., Plaintiffs and Appellants, v.
CITY AND COUNTY OF SAN FRANCISCO, Defendant and Respondent.

**COUNSEL**

J. Michael Schaefer for Plaintiffs and Appellants.

Dennis J. Herrera and Louise H. Renne, City Attorneys, Therese M. Stewart, Chief Deputy City Attorney, Thomas J. Owen, Randy Riddle, Ellen Forman and K. Scott Dickey, Deputy City Attorneys, for Defendant and Respondent.

Rockard J. Delgadillo, City Attorney (Los Angeles), Patricia V. Tubert, Claudia Culling and Anthony Saul Alperin, Assistant City Attorneys, for Cities of Los Angeles, Monterey and Redlands as Amici Curiae on behalf of Defendant and Respondent.

**OPINION**

**BROWN, J.**—The question presented by this case is whether former section 13.102 of article XIII of the Charter of the City and County of San Francisco (repealed Mar. 5, 2000; hereafter section 13.102), by prohibiting write-in voting in *runoff* elections for municipal offices, violated the free speech clause of the California Constitution (art. I, § 2, subd. (a)). We conclude it did not.

In *Canaan v. Abdelnour* (1985) 40 Cal.3d 703 [221 Cal.Rptr. 468, 710 P.2d 268, 69 A.L.R.4th 915] (*Canaan*), this court struck down, as violative of the free speech clauses of both the state and federal Constitutions, San Diego's prohibition on write-in voting in its municipal general elections. However, in *Burdick v. Takushi* (1992) 504 U.S. 428 [112 S.Ct. 2059, 119 L.Ed.2d 245] (*Burdick*), the United States Supreme Court later upheld, against a federal constitutional challenge, Hawaii's total ban on write-in voting.

 The California free speech clause is broader and more protective than the First Amendment free speech clause. (*Los Angeles Alliance for Survival v. City of Los Angeles* (2000) 22 Cal.4th 352, 366-367 [93 Cal.Rptr.2d 1, 993 P.2d 334].) However, the fact that our provision is worded more expansively and has been interpreted as being more protective than the First Amendment in some respects does not mean that it is broader in all its applications. (*Los Angeles Alliance*, at p. 367.) Generally, when we interpret a provision of the California Constitution that is similar to a provision of the federal Constitution, we will not depart from the United States Supreme Court's construction of the similar federal provision unless we are given cogent reasons to do so. (*People v. Monge* (1997) 16 Cal.4th 826, 844 [66 Cal.Rptr.2d 853, 941 P.2d 1121].) And, specifically, "[i]n analyzing constitutional challenges to election laws, this court has followed closely the analysis of the United States Supreme Court. [Citations.]" (*Canaan, supra*, 40 Cal.3d at p. 710.) That is what this court tried to do in *Canaan*. The *Canaan* court anticipated, correctly, that the high court would review a challenge to a restriction on write-in voting under the standard it had announced in *Anderson v. Celebrezze* (1983) 460 U.S. 780 [103 S.Ct. 1564, 75 L.Ed.2d 547] (*Anderson*).[1] However, even though the *Canaan* court voiced the right standard, it got the wrong answer, at least as far as the federal Constitution is concerned, as *Burdick* revealed.

Given that *Burdick* upheld a total ban on write-in voting, plaintiffs cannot, and do not, contend that San Francisco's ban on write-in voting in runoff elections violated their First and Fourteenth Amendment rights under the *Anderson/Burdick* standard. Instead, plaintiffs claim the free speech clause of the California Constitution provides greater protection for write-in candidates and voters than does the free speech clause of the federal Constitution. However, plaintiffs have entirely failed to supply us with cogent reasons, and we have discovered none ourselves, to conclude that disallowing

---

[1] In *Anderson, supra*, 460 U.S. 780, as was explained in *Canaan*, "the court struck down Ohio's early presidential candidate filing deadline, finding the state's interest in the early deadline to be insufficient to justify its adverse effects on independent political candidates, parties, and voters." (*Canaan, supra*, 40 Cal.3d at p. 712.)

write-in voting in *runoff* elections violates the free speech clause of the California Constitution. Because San Francisco allows write-in voting in its municipal general elections, we need not reach the question whether a *total* ban on write-in voting would offend the state Constitution.

## FACTUAL AND PROCEDURAL BACKGROUND

At the General Election held on November 6, 1973, San Francisco voters approved Proposition D, a measure amending the election provisions of the San Francisco charter to provide, in the event no mayoral candidate received a majority of the votes cast, for a runoff contest between the two candidates receiving the highest number of votes. In the ballot pamphlet, the proponents of Proposition D argued that its adoption was necessary to ensure that the mayor would in the future be elected by a majority of the voters. "The office of Mayor is now chosen by a plurality vote. Under this archaic voting system mayors in San Francisco may be voted into office by support of a very small minority of the voters—even a scant twenty percent or less. This is made possible because of the increasing number of candidates who run for the office of Mayor. Under the present system San Francisco has elected a Mayor representing a majority vote only five times in the last eleven mayoral elections." (S.F. Ballot Pamp., Gen. Mun. Elec. (Nov. 6, 1973) pp. 60-61.)

The runoff provision, which was codified in section 13.102, was subsequently amended to include almost all elective offices in San Francisco. Although the text of section 13.102, at the time of the election in question, did not expressly so provide,[2] both as a matter of local elections practice and in the opinion of the city attorney, the section has been interpreted as prohibiting write-in voting for mayor.

This lawsuit by two plaintiffs—Michael Edelstein, a would-be write-in candidate for mayor, and Richard Winger, a registered voter who supported his candidacy—was filed on the eve of the 1999 mayoral runoff election. In their complaint for declaratory relief, plaintiffs contended that section 13.102 burdened the unfettered right of electors to vote for the candidate of their choice by writing in his or her name on the ballot and therefore ran afoul of the free speech provision of the California Constitution. (Cal. Const., art. I, § 2, subd. (a).) Ballots issued to voters by Patricia Fado, the city's then director of elections, did not provide space for write-in candidates, the complaint alleged, and were treated as void if altered by any

---

[2] Section 13.102 then provided: "If no candidate for any elective office of the City and County [excepting offices not relevant here] receives a majority of the votes cast at an election for such office, the two candidates receiving the most votes shall qualify to have their names placed on the ballot for a municipal runoff election."

writings on them. Moreover, plaintiffs alleged, the defendant director refused to accept plaintiff Edelstein's write-in candidacy for mayor.

Complaining of the inability to run for the office of mayor as a write-in candidate, and the reciprocal inability of municipal electors to choose a mayoral candidate by writing in his or her name on the ballot, plaintiffs sought, unsuccessfully, emergency preelection injunctive relief from the superior court, the Court of Appeal, and this court prior to the December 1999 mayoral runoff election. Following the election, the San Francisco City and County Superior Court granted defendant's motion for judgment on the pleadings, and this appeal ensued.

The Court of Appeal reversed and remanded the cause for entry of a final judgment granting appropriate declaratory relief in favor of plaintiffs. Under the doctrine of stare decisis, the Court of Appeal felt compelled to do so. However, in light of *Burdick*, the Court of Appeal aptly suggested that "this case might serve as the vehicle for the California Supreme Court to examine the current vitality of *Canaan*, a task we are constrained from undertaking."

## DISCUSSION

Plaintiffs' brief in this court obliquely raises the preliminary question whether this case is moot.

### I. *Mootness*

On March 5, 2002, after this court granted review, San Francisco voters adopted Proposition A, a charter amendment replacing San Francisco's system of holding a runoff election when no candidate receives a majority of the votes in the general election with a system of *instant runoff elections* accomplished by *ranked choice* voting. The digest of Proposition A in the voter information pamphlet gave the following explanation of the *instant runoff voting method*: "With this method, each voter would have the opportunity to rank at least a first, second, and third choice among the candidates for each office. The votes would be counted in rounds. If one candidate received more than 50% of the first-choice votes in the first round, then that candidate would be elected. If no candidate received more than 50% of the first-choice votes, the candidate who received the fewest first-choice votes would be eliminated. All voters whose first choice was eliminated would have their vote transferred to their second-choice candidate. This process of transferring votes to the voter's next-choice candidate and eliminating candidates with the fewest votes would be repeated until one candidate received

more than 50% of the votes." (S.F. Voter Information Guide, Primary Elec. (Mar. 5, 2002) p. 37.)[3]

■ In calling our attention to Proposition A, plaintiffs imply, although they do not expressly claim, that the question presented by this case is moot because San Francisco will no longer be holding what we may refer to as *conventional runoff elections*. However, as defendant points out, Proposition A, by its terms, provides for the possibility that San Francisco may hold a conventional runoff election in December 2002. In the event that no candidate for certain offices receives a majority in San Francisco's general election in November 2002, then San Francisco shall hold a conventional runoff election in December 2002, "[i]f the Director of Elections certifies to the Board of Supervisors and the Mayor no later than July 1, 2002 that the Department of Elections will not be ready to implement ranked-choice balloting in November 2002 . . . ." (S.F. Voter Information Guide, *supra*, text of Prop. A, p. 46.)

Moreover, defendant has furnished us with a copy of a letter, dated July 1, 2002, from Jon Arntz, Acting Director of the Department of Elections of the City and County of San Francisco, to Mayor Willie L. Brown. In the letter Mr. Arntz informs the mayor that the Department of Elections will be unable to implement ranked-choice balloting in November 2002. The reasons for the delay, Mr. Arntz explains, are that the necessary software is still being developed, the Secretary of State's certification of the software will have to be obtained, the software must be tested by the department, and voter education materials must be developed.

---

[3]Defendant requests that we take judicial notice of three items of information: (1) the portions of the San Francisco voter information pamphlet for the March 5, 2002, Primary Election that dealt with Proposition A; (2) the San Francisco results of the March 5, 2002, Primary Election; and (3) the portions of the California voter information pamphlet for the March 5, 2002, Primary Election that dealt with state Proposition 43 (right to have vote counted). We grant all three requests, although the relevance of Proposition 43 is not clear. (See *People v. Snyder* (2000) 22 Cal.4th 304, 309, fn. 5 [92 Cal.Rptr.2d 734, 992 P.2d 1102] [taking judicial notice of ballot arguments for proposition]; *Huntington Beach City Council v. Superior Court* (2002) 94 Cal.App.4th 1417, 1424, fn. 2 [115 Cal.Rptr.2d 439] [taking judicial notice of election results].)

Plaintiffs request that we take judicial notice of the 1998 New York Times Index. The index apparently references a news article that recounts the facts surrounding an election in Tennessee in which one candidate murdered the other. It is questionable whether the reporting concerning this out-of-state election—which plaintiffs presumably want to use to show the usefulness of write-in candidacies—would constitute "[f]acts and propositions that are not reasonably subject to dispute and are capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy." (Evid. Code, § 452, subd. (h).) We might determine that an article resides in the New York Times Index, but that would not mean that the truth of the article had been shown with "reasonably indisputable accuracy." We deny the request.

Finally, even if Proposition A could have been implemented in time for the next mayoral general election, the question presented by this case would not have been moot. " '[I]f a pending case poses an issue of broad public interest that is likely to recur, the court may exercise an inherent discretion to resolve that issue even though an event occurring during its pendency would normally render the matter moot.' (*In re William M.* (1970) 3 Cal.3d 16, 23 [89 Cal.Rptr. 33, 473 P.2d 737].) We have frequently exercised such discretion to resolve constitutional issues pertaining to election laws raised by candidates in elections that were held before decision could be reached. (*Johnson* v. *Hamilton* (1975) 15 Cal.3d 461, 465 [125 Cal.Rptr. 129, 541 P.2d 881]; *Knoll* v. *Davidson* (1974) 12 Cal.3d 335, 344 [116 Cal.Rptr. 97, 525 P.2d 1273]; see also *Storer* v. *Brown* (1974) 415 U.S. 724, 737, fn. 8 [39 L.Ed.2d 714, 727, 94 S.Ct. 1274].)" (*Libertarian Party* v. *Eu* (1980) 28 Cal.3d 535, 539-540 [170 Cal.Rptr. 25, 620 P.2d 612].) The question presented by this case is of broad public interest and it is likely to recur, if not in San Francisco elections, then in elections in other charter cities. In an amici curiae brief filed in support of defendant, the Cities of Los Angeles, Monterey and Redlands point out that charter cities have plenary power under the California Constitution over their municipal election procedures (Cal. Const., art. XI, § 5, subd. (b)), that other charter cities besides San Francisco have chosen to exercise that authority by disallowing write-in voting in their runoff elections, and that yet other charter cities may choose to do so.[4]

## II. *Elections Code Section 15340*

Plaintiffs contend section 13.102 violates not only the free speech clause of the California Constitution, but also section 15340 of the Elections Code (section 15340).

Section 15340 provides: "Each voter is entitled to write the name of any candidate for any public office, including that of President and Vice President of the United States, on the ballot of any election."

---

[4]On May 17, 2002, we received an application by the Cities of Los Angeles, Monterey and Redlands for leave to file an amici curiae brief in support of defendant. The application was late, the reply brief having been filed on April 4, 2002. Counsel for amici curiae explained that he was seeking permission to file the brief late because he had been required to handle other complicated, time-sensitive matters. The application for permission to file the amici curiae brief was granted on May 22, 2002. On May 29, 2002, we received plaintiffs' motion to strike the application to file the amici curiae brief. Plaintiffs asserted (a) that the application by amici curiae was at least 43 days late, and (b) that the application did not acknowledge it was late. Neither assertion was true. On June 4, 2002, we received plaintiffs' motion to reconsider the granting of the application to file the amici curiae brief. Both of plaintiffs' motions—the motion received on May 29, 2002, and the motion received on June 4, 2002—are denied.

Defendant contends that plaintiffs' argument, that section 15340 guarantees the right of San Francisco voters to cast write-in votes in a runoff election, fails because the right to run as a write-in candidate in a city runoff election is not a matter of statewide concern and, accordingly, the constitutional "home rule" provision (Cal. Const., art. XI, § 5, subds. (a), (b)) exempts a charter city like San Francisco from complying with section 15340.

Section 5, subdivision (b) of article XI of the California Constitution provides in part: "It shall be competent in all city charters to provide, in addition to those provisions allowable by this Constitution, and by the laws of the State for: . . . (3) conduct of city elections and (4) plenary authority is hereby granted, subject only to the restrictions of this article, to provide therein or by amendment thereto, the manner in which, the method by which, the times at which, and the terms for which the several municipal officers . . . shall be elected or appointed . . . ." We applied this constitutional provision in *Johnson v. Bradley* (1992) 4 Cal.4th 389 [14 Cal.Rptr.2d 470, 841 P.2d 990], which concerned partial public funding of city elective offices. We explained that *California Fed. Savings & Loan Assn. v. City of Los Angeles* (1991) 54 Cal.3d 1 [283 Cal.Rptr. 569, 812 P.2d 916], established a framework "for resolving municipal-affairs and statewide-concern questions under subdivision (a) of article XI, section 5. When the local matter under review 'implicates a "municipal affair" and poses a genuine conflict with state law, the question of statewide concern is the bedrock inquiry through which the conflict between state and local interests is adjusted. If the subject of the statute fails to qualify as one of statewide concern, then the conflicting charter city measure is a "municipal affair" and "beyond the reach of legislative enactment." . . . If, however, the court is persuaded that the subject of the state statute is one of statewide concern and that the statute is reasonably related [and "narrowly tailored"] to its resolution, then the conflicting charter city measure ceases to be a "municipal affair" pro tanto and the Legislature is not prohibited by article XI, section 5[, subdivision] (a), from addressing the statewide dimension by its own tailored enactments.' " (*Johnson v. Bradley, supra,* at p. 399, fn. omitted, quoting *California Fed. Savings & Loan Assn., supra,* at p. 17.) ·

In this case, however, we need not apply this framework for resolving municipal-affairs and statewide-concern questions. Prohibiting write-in voting in runoff elections would not violate section 15340 even if San Francisco were not a charter city. Section 15340 gives voters the right to write in the names of candidates in "any election." In the election in question, the San Francisco mayoral election of 1999, voters had the opportunity to write in the names of candidates once, in the first round of voting;

they simply did not have the opportunity to do so a second time, in the runoff. This satisfied section 15340, because there was a single *election*, although there were two rounds of voting.

III. *Canaan and Burdick*

Although this court grounded its decision in *Canaan* on article I, section 2, subdivision (a) of the California Constitution, as well as the First Amendment to the United States Constitution (*Canaan, supra*, 40 Cal.3d at pp. 715, 727), we observed that, "[i]n analyzing constitutional challenges to election laws, this court has followed closely the analysis of the United States Supreme Court. [Citations.]" (*Id.* at p. 710.) Following this practice, the *Canaan* court correctly anticipated that a prohibition on write-in voting should be reviewed under the standard announced by the United States Supreme Court in *Anderson, supra*, 460 U.S. 780. (*Canaan*, at pp. 712-715; see *Burdick, supra*, 504 U.S. at pp. 433-438 [112 S.Ct. at pp. 2063-2065].)

Under the *Anderson* standard, as the high court reiterated in *Burdick*, "the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights. Thus, as we have recognized when those rights are subjected to 'severe' restrictions, the regulation must be 'narrowly drawn to advance a state interest of compelling importance.' *Norman* v. *Reed*, 502 U.S. 279, 289 [112 S.Ct. 698, 705, 116 L.Ed.2d 711] (1992). But when a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions. *Anderson*, 460 U.S., at 788 [103 S.Ct. at pp. 1569-1570]; see also *id.*, at 788-789, n. 9 [103 S.Ct. at p. 1570]. We apply this standard in considering petitioner's challenge to Hawaii's ban on write-in ballots." (*Burdick, supra*, 504 U.S. at p. 434 [112 S.Ct. at pp. 2063-2064].)

Although this court in *Canaan* and the United States Supreme Court in *Burdick* voiced the same standard—the *Anderson* standard—in reviewing the constitutionality of bans on write-in voting, they came to different conclusions. They came to different conclusions as to the ultimate constitutional question because they reached different conclusions as to a preliminary question—whether a ban on write-in voting is a *severe* restriction on voting rights or is only a *reasonable, nondiscriminatory* restriction. The *Canaan* court concluded that San Diego's ban on write-in voting in municipal general elections constituted such a "drastic" restriction on the "fundamental rights of candidacy and voting" that San Diego had the burden of demonstrating that "less drastic" alternatives would not have advanced the interests

that led it to adopt the ban, a burden the court found San Diego had failed to carry. (*Canaan, supra,* 40 Cal.3d at pp. 719, 724.) The *Burdick* court, on the other hand, concluded that Hawaii's total ban on write-in voting "imposes only a limited burden on voters' rights to make free choices and to associate politically through the vote," and that the "legitimate interests asserted by the State are sufficient to outweigh the limited burden that the write-in voting ban imposes upon Hawaii's voters." (*Burdick, supra,* 504 U.S. at pp. 439, 440 [112 S.Ct. at pp. 2066, 2067], fn. omitted.)

## A. *This Court's Interpretation of Anderson in Canaan*

The *Canaan* court relied on the following explanation by the *Anderson* court of the standard announced in that case: " 'Constitutional challenges to specific provisions of a State's election laws . . . cannot be resolved by any "litmus-paper test" that will separate valid from invalid restrictions. [Citation.] Instead, a court must resolve such a challenge by an analytical process that parallels its work in ordinary litigation. It must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional. [Citations.] The results of this evaluation will not be automatic; as we have recognized, there is "no substitute for the hard judgments that must be made." [Citation.]' (*Anderson, supra,* 460 U.S. at pp. 789-790 [75 L.Ed.2d at p. 558].)" (*Canaan, supra,* 40 Cal.3d at p. 712, fn. omitted.)

Petitioners contended, and the *Canaan* court agreed, that San Diego's prohibition on write-in voting affected two important rights. "One is the right of candidates to pursue public office. The other, and more fundamental right, is that of the voters to cast their ballots for the candidates of their choice. Both rights are of constitutional dimension. Both are curtailed by a ban on write-in voting." (*Canaan, supra,* 40 Cal.3d at p. 714.)

"Both these rights," the *Canaan* court observed, "are of sufficient magnitude to warrant the protection of the First and Fourteenth Amendments and the comparable provisions of our state Constitution (see Cal. Const., art. I, § 2). It is necessary, then, to examine the 'character and magnitude of the asserted injury' to those fundamental rights imposed by San Diego's ban on

write-in voting. (*Anderson, supra*, 460 U.S. at p. 789 [75 L.Ed.2d at p. 558].)" (*Canaan, supra*, 40 Cal.3d at p. 715, fn. omitted.)

San Diego's ban on write-in voting, in the *Canaan* court's view, affected the more fundamental right to vote in two ways. "First, it may very well prevent the candidate preferred by the majority of voters from winning election. This is especially likely in situations such as this case, where significant political changes occurred in the interim between the primary and the general election. (See *Anderson, supra*, 460 U.S. at pp. 790-791, fn. 11 [75 L.Ed.2d at pp. 558-559].) [¶] Second, it prevents individual voters from casting ballots for their preferred candidates, whether or not those candidates have any chance of winning election. 'A write-in ballot permits a voter to effectively exercise his *individual* constitutionally protected franchise. The use of write-in ballots does not and should not [] depend[] on the candidate's chance of success.' (*Socialist Labor Party* v. *Rhodes* (S.D.Ohio 1968) 290 F.Supp. 983, 987, affd. in part, mod. in part *sub. nom.*, *Williams* v. *Rhodes* [(1968)] 393 U.S. 23 [89 S.Ct. 5, 21 L.Ed.2d 24], italics added.)" (*Canaan, supra*, 40 Cal.3d at pp. 716-717, fn. omitted.)

The City of San Diego advanced several justifications in support of its prohibition on write-in voting. "Specifically, they claim that the ordinance is necessary to assure that (1) candidates meet charter qualifications, (2) candidates have displayed a willingness to serve, (3) the public will have adequate time to investigate and evaluate the candidate's abilities, experience, credentials, and capacity for the office, and (4) the candidate elected will receive a majority of the votes. Respondents also claim that write-in voting would disrupt the scheme for election of the city council." (*Canaan, supra*, 40 Cal.3d at p. 718.)

The *Canaan* court found that "none [of the proffered justifications] warrants the drastic method selected to achieve its ends. Quite simply, a total ban on write-in voting is a grossly overbroad means to achieve the stated goals. In order to warrant burdening the fundamental rights of candidacy and voting, respondents must demonstrate that there are no less drastic alternatives to a prohibition on write-in voting. [Citation.]" (*Canaan, supra*, 40 Cal.3d at p. 719.) "It is clear," the *Canaan* court added, "that the *Anderson* balancing test requires consideration of whether less drastic alternatives are available to achieve the governmental interests at stake. (*Anderson, supra*, 460 U.S. at p. 789 [75 L.Ed.2d at p. 558]; *Smith* v. *Bd. of Election Com'rs for City of Chicago* [(N.D.Ill. 1984)] 587 F.Supp. [1136,] 1146, 1150; *Libertarian Party of South Dakota* v. *Kundert* [(D.S.D. 1984)] 579 F.Supp. [735,] 739-740.)" (*Canaan*, at p. 719, fn. 13.)

San Diego, the *Canaan* court concluded, had failed to carry its burden of demonstrating that there were no less drastic alternatives to a prohibition on

write-in voting. "A balancing of the rights of the candidates and voters against the interests asserted by respondents leads to the conclusion that San Diego's prohibition on write-in voting is unconstitutional. A ban on write-in voting burdens the right to be a candidate for public office and the fundamental right to vote for the candidate of one's choice. None of the justifications posited by the city are sufficient to outweigh the injury to these constitutional rights. Further, a ban on write-in voting is not the least restrictive alternative available to achieve the city's goals." (*Canaan, supra,* 40 Cal.3d at p. 724.)

B. *The High Court's Application of Anderson in Burdick*

As previously explained, the Hawaii ban on write-in voting upheld in *Burdick* was broader than either the San Diego ban invalidated by the *Canaan* court or the San Francisco ban we review now. Hawaii did not permit write-in voting in *any* of its elections (*Burdick, supra,* 504 U.S. at pp. 430-432 [112 S.Ct. at pp. 2061-2062]), whereas San Diego permitted write-in voting in primary elections, but not in general elections or recall elections (*Canaan, supra,* 40 Cal.3d at pp. 707-708), and San Francisco permitted write-in voting in municipal general elections, but not in runoff elections.

"The appropriate standard for evaluating a claim that a state law burdens the right to vote," the *Burdick* court explained, "is set forth in *Anderson*." (*Burdick, supra,* 504 U.S. at p. 438 [112 S.Ct. at p. 2066].) Again, the *Burdick* court restated the *Anderson* standard as follows: "Under this standard, the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights. Thus, as we have recognized when those rights are subjected to 'severe' restrictions, the regulation must be 'narrowly drawn to advance a state interest of compelling importance.' *Norman* v. *Reed,* 502 U.S. 279, 289 [112 S.Ct. 698, 116 L.Ed.2d 711] (1992). But when a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions. *Anderson,* 460 U.S., at 788 [103 S.Ct. at p. 1570]; see also *id.,* at 788-789, n. 9788 [103 S.Ct. at p. 1570]." (*Burdick,* at p. 434 [112 S.Ct. at pp. 2063-2064].) "Applying [the *Anderson*] standard, we conclude that, in light of the adequate ballot access afforded under Hawaii's election code, the State's ban on write-in voting imposes only a limited burden on voters' rights to make free choices and to associate politically through the vote." (*Id.* at pp. 438-439 [112 S.Ct. at p. 2066].)

The *Burdick* court analyzed Hawaii's ban on write-in voting as one aspect of the state's overall ballot access system. To obtain a position on Hawaii's

general election ballot, the court explained, a candidate had to participate in the state's open primary, and there were three methods that enabled a candidate to appear on the primary ballot: the filing of a party petition, the established party route, and the designated nonpartisan ballot. (*Burdick, supra*, 504 U.S. at pp. 435-436 [112 S.Ct. at p. 2064].) This system, the court found, "provides for easy access to the ballot until the cutoff date for the filing of nominating petitions, two months before the primary. Consequently, any burden on voters' freedom of choice and association is borne only by those who fail to identify their candidate of choice until days before the primary. But in *Storer* v. *Brown*, we gave little weight to 'the interest the candidate and his supporters may have in making a late rather than an early decision to seek independent ballot status.' 415 U.S., at 736 [94 S.Ct. at p. 1201]. Cf. *Rosario* v. *Rockefeller*, 410 U.S. 752, 757 [93 S.Ct. 1245, 36 L.Ed.2d 1] (1973). We think the same reasoning applies here and therefore conclude that any burden imposed by Hawaii's write-in vote prohibition is a very limited one." (*Burdick, supra*, 504 U.S. at pp. 436-437 [112 S.Ct. at p. 2065], fn. omitted.)

The *Burdick* court "turn[ed] next to the interests[—avoiding unrestrained factionalism and preventing party raiding—]asserted by Hawaii to justify the burden imposed by its prohibition of write-in voting. *Because we have already concluded that the burden is slight, the State need not establish a compelling interest to tip the constitutional scales in its direction.* Here, the State's interests outweigh petitioner's limited interest in waiting until the eleventh hour to choose his preferred candidate." (*Burdick, supra*, 504 U.S. at p. 439 [112 S.Ct. at p. 2066], italics added.)

The step in the high court's analysis that we have emphasized—that the burden imposed by Hawaii's ban on write-in voting was slight, and that it, therefore, did not have to be justified by a compelling state interest—was critical. The majority and dissenting opinions in *Burdick* turned on this point. "Although the dissent purports to agree with the standard we apply in determining whether the right to vote has been restricted, *post*, at 445-446 [112 S.Ct. at pp. 2069-2070], and implies that it is analyzing the write-in ban under some minimal level of scrutiny, *post*, at 448 [112 S.Ct. at p. 2071], the dissent actually employs strict scrutiny. This is evident from its invocation of quite rigid narrow tailoring requirements. For instance, the dissent argues that the State could adopt a less drastic means of preventing sore-loser candidacies, *ibid.*, and that the State could screen out ineligible candidates through postelection disqualification rather than a write-in voting ban. *Post*, at 450 [112 S.Ct. at p. 2072]." (*Burdick, supra*, 504 U.S. at p. 440, fn 10 [112 S.Ct. at p. 2067].)

What the *Burdick* majority said of the *Burdick* dissenters might be said of the *Canaan* court as well. That is, like the dissenters in *Burdick*, the *Canaan*

court voiced the *Anderson* standard. However, because the *Canaan* court found that San Diego's restriction on write-in voting did a "serious injury to the right to vote" (*Canaan, supra,* 40 Cal.3d at p. 716), the court required the city to "demonstrate that there are no less drastic alternatives to a prohibition on write-in voting" (*id.* at p. 719).

The majority in *Burdick* reiterated its conclusion: "[W]hen a State's ballot access laws pass constitutional muster as imposing only reasonable burdens on First and Fourteenth Amendment rights—as do Hawaii's election laws—a prohibition on write-in voting will be presumptively valid, since any burden on the right to vote for the candidate of one's choice will be light and normally will be counterbalanced by the very state interests supporting the ballot access scheme." (*Burdick, supra,* 504 U.S. at p. 441 [112 S.Ct. at p. 2067].)

IV. *Whether the California Constitution Provides Greater Protection for Write-in Voting Than the Federal Constitution*

To reiterate: The California free speech clause is broader and more protective than the First Amendment free speech clause. (*Los Angeles Alliance for Survival v. City of Los Angeles, supra,* 22 Cal.4th at pp. 366-367.) However, the fact that our provision is worded more expansively and has been interpreted as being more protective than the First Amendment in some respects does not mean that it is broader than its federal counterpart in all its applications. (*Los Angeles Alliance,* at p. 367.) Generally, when we interpret a provision of the California Constitution that is similar to a provision of the federal Constitution, we will not depart from the United States Supreme Court's construction of the similar federal provision unless we are given cogent reasons to do so. (*People v. Monge, supra,* 16 Cal.4th at p. 844.) And, specifically, "[i]n analyzing constitutional challenges to election laws, this court has followed closely the analysis of the United States Supreme Court. [Citations.]" (*Canaan, supra,* 40 Cal.3d at p. 710.)

First, we turn to the text of the free speech clause of the California Constitution. Like the First Amendment,[5] article I, section 2, subdivision (a) does not expressly address voting rights. "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for

---

[5]"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances." (U.S. Const., 1st Amend.)

the abuse of this right. A law may not restrain or abridge liberty of speech or press." (Cal. Const., art. I, § 2, subd. (a).)[6]

As for the legislative history of the provision, the original framers of the California Constitution adopted the free speech clause "with *no debate*. (See Browne, Rep. of Debates in Convention of Cal. on Formation of State Const. (1973 ed.) p. 41 (Browne); see also [Friesen, *Should California's Constitutional Guarantees of Individual Rights Apply Against Private Actors?* (1989)] 17 Hastings Const. L.Q. [111,] 119 [(*Private Actors*)].)" (*Golden Gateway Center v. Golden Gateway Tenants Assn., supra,* 26 Cal.4th at p. 1024.)

■■■ Plaintiffs do not discuss the language or the history of the California Constitution's free speech clause, much less its New York antecedent.[7] However, the fact that the *Burdick* court upheld a total ban on write-in voting, while the *Canaan* court struck down a less restrictive ban, does *not* appear to be explainable on the basis of differences between the text or history of the free speech clauses of the federal and California Constitutions. Rather, the explanation appears to be that the *Canaan* court simply placed a higher value than the *Burdick* court on what the *Burdick* court referred to as the "expressive function" of voting (*Burdick, supra,* 504 U.S. at p. 438 [112 S.Ct. at p. 2066]).

As we explained earlier, the *Canaan* and *Burdick* courts came to different conclusions as to the ultimate constitutional question because they reached different conclusions as to the preliminary question whether a ban on

---

[6]"Although the designation of article I's free speech clause has changed appreciably over the years . . . its language has not. [Citation.]" (*Gerawan Farming, Inc. v. Lyons* (2000) 24 Cal.4th 468, 489 [101 Cal.Rptr.2d 470, 12 P.3d 720].) "Thus, the current incarnation of California's free speech clause is virtually identical to the free speech clause in the original California Constitution adopted in 1849. (Compare Cal. Const., art. I, § 2, subd. (a) with Cal. Const. of 1849, art. I, § 9.)" (*Golden Gateway Center v. Golden Gateway Tenants Assn.* (2001) 26 Cal.4th 1013, 1024 [111 Cal.Rptr.2d 336, 29 P.3d 797].)

[7]"Many of the framers of the 1849 California Constitution came from New York. (See Browne, *supra,* at pp. 478-479.) Not surprisingly, in drafting the free speech clause, the framers borrowed from the free speech clause of the New York Constitution. (Browne, *supra,* at p. 31.) Because they adopted New York's free speech clause virtually unchanged and with no debate (*Private Actors, supra,* 17 Hastings Const. L.Q. at p. 119), the history behind New York's clause is relevant to interpreting California's free speech clause (see *Citizens for Parental Rights v. San Mateo County Bd. of Education* (1975) 51 Cal.App.3d 1, 25-26, fn. 26 [124 Cal.Rptr. 68, 82 A.L.R.3d 544] [finding the history behind the New York Constitution relevant to interpreting a clause of the California Constitution based on a clause in the New York Constitution])." (*Golden Gateway Center v. Golden Gateway Tenants Assn., supra,* 26 Cal.4th at p. 1025.)

In 1892, the Court of Appeals of New York suggested, in dictum, that a prohibition of write-in voting would carry with it "the taint of unconstitutionality," but the court did not explain whether it had the federal or state Constitution in mind. (*People ex rel. Bradley v. Suaw* (1892) 133 N.Y. 493 [31 N.E. 512, 512].)

write-in voting is a *severe* restriction on voting rights. The different conclusions the two courts reached on this preliminary question largely depended, in turn, on their differing assessments of the importance of the *expressive function* of voting.

The *Canaan* court assigned a high value to that function. A ban on write-in voting, the *Canaan* court observed, "prevents individual voters from casting ballots for their preferred candidates, whether or not those candidates have any chance of winning election. 'A write-in ballot permits a voter to effectively exercise his *individual* constitutionally protected franchise. The use of write-in ballots does not and should not [] depend[] on the candidate's chance of success.' [Citations.] [¶] There will always be voters whose views, interests or priorities are not in any way represented by the candidates appearing on the ballot. While candidates who do represent these voters' views may have little chance of success, it is important in a free society that political diversity be given expression." (*Canaan, supra,* 40 Cal.3d at p. 717, fn. omitted.)

The *Burdick* court, on the other hand, assigned the *expressive function* of voting a much lower value. "[T]he function of the election process is 'to winnow out and finally reject all but the chosen candidates,' *Storer,* 415 U.S., at 735 [94 S.Ct. at p. 1281], not to provide a means of giving vent to 'short-range political goals, pique, or personal quarrel[s].' *Ibid.* Attributing to elections a more generalized expressive function would undermine the ability of States to operate elections fairly and efficiently. *Id.,* at 730 [94 S.Ct. at p. 1279]." (*Burdick, supra,* 504 U.S. at p. 438 [112 S.Ct. at p. 2066].) The objection to Hawaii's ban on write-in voting, the *Burdick* court continued, "amounts to nothing more than the insistence that the State record, count, and publish individual protests against the election system or the choices presented on the ballot through the efforts of those who actively participate in the system. There are other means available, however, to voice such generalized dissension from the electoral process; and we discern no adequate basis for our requiring the State to provide and to finance a place on the ballot for recording protests against its constitutionally valid election laws." (*Id.* at p. 441 [112 S.Ct. at p. 2067], fn. omitted.)

Significantly, the dissenting opinion in *Burdick,* written by Justice Kennedy, agreed with the majority on this point. "I agree with the first premise in the majority's legal analysis. The right at stake here is the right to cast a meaningful vote for the candidate of one's choice. Petitioner's right to freedom of expression is not implicated. His argument that the First Amendment confers upon citizens the right to cast a protest vote and to have government officials count and report this vote is not persuasive. As the

majority points out, the purpose of casting, counting, and recording votes is to elect public officials, not to serve as a general forum for political expression." (*Burdick, supra,* 504 U.S. 428, 445 [112 S.Ct. at p. 2069] (dis. opn. of Kennedy, J.).)

By focusing on the *expressive* element of write-in voting, we do not mean to suggest that registering a protest is the only practical significance of write-in voting, or that write-in candidacies are necessarily quixotic. For an example of a write-in candidacy that was startlingly successful, one need go no further than the 1999 mayoral general election in San Francisco, the contest that resulted in the runoff election under consideration here. Despite a late start and a relatively small campaign budget, write-in candidate Supervisor Tom Ammiano finished second in the election for mayor, ahead of former Mayor Frank Jordan, and secured a place in the runoff election against incumbent Mayor Willie Brown. (See Epstein & Wildermuth, *Ammiano vs. Brown: Write-in Votes Catapult Supervisor into S.F. Runoff,* S.F. Chronicle (Nov. 5, 1999) p. A-1; Herscher, *Making History: Ammiano Campaign Rises from the Grass Roots,* S.F. Chronicle (Nov. 4, 1999) p. A-21.)

■ However, if the function of the election process, generally, is to winnow out and finally reject all but the chosen candidates, not simply to provide an outlet for political expression (*Burdick, supra,* 504 U.S. at p. 438 [112 S.Ct. at pp. 2065-2066]), a fortiori, that is the function of a runoff election. Permitting write-in votes even in the runoff would defeat San Francisco's purpose in having a runoff election—to ensure that the winning candidate receive a majority of the votes. Write-in votes could perpetually deny anyone a majority. Indeed, allowing write-in votes in the runoff would permit a defeated candidate to continue running—as a write-in candidate.

We conclude that San Francisco's prohibition against write-in voting in the mayoral runoff election was not a *severe* restriction on voting rights, but rather that it imposed only a *limited burden* on voters' rights to make free choices and to associate politically through the vote. (See *Burdick, supra,* 504 U.S. at p. 439 [112 S.Ct. at p. 2066].) After all, voters were not denied an opportunity to cast a write-in ballot for the candidate of their choice. They were only denied the opportunity to cast a write-in ballot *twice.* Indeed, as we noted above, in the 1999 mayoral runoff election, one of the two candidates, Supervisor Tom Ammiano, had been a write-in candidate in the mayoral general election.

Having decided that disallowing write-in voting in runoff elections imposes only a limited burden on voters' rights to make free choices and to

associate politically through the vote, the remaining question is what weight to give the interest that led San Francisco voters in 1973 to adopt Proposition D's ban on write-in voting in runoff elections—ensuring that its mayors were elected by a majority of the city's voters, rather than a plurality. (S.F. Ballot Pamp., Gen. Mun. Elec., *supra*, at pp. 60-61.) Plurality rule is not anathema to the federal or state Constitutions. Indeed, our last three presidents have been elected by a plurality of the popular vote. (See Presidential Election Results (2000) <http://www.uselectionatlas.org/USPRESIDENT/ GENERAL/pe2000.html> [as of Nov. 7, 2002].) However, given the centrality of the concept of majority rule in the founding documents of American democracy,[8] surely the desire of San Franciscans to have their mayors elected by a majority of the voters is, in the language of the high court, "presumptively valid" (*Burdick, supra,* 504 U.S. at p. 441 [112 S.Ct. at p. 2067]).

For the foregoing reasons, we conclude that section 13.102 did not violate article I, section 2, subdivision (a) of the California Constitution by prohibiting write-in voting in runoff elections. Because San Francisco permitted write-in voting in its mayoral general election, we need not reach the question whether a total ban on write-in voting would offend the state Constitution. *Canaan v. Abdelnour, supra,* 40 Cal.3d 703, is overruled to the extent, but only to the extent, it is inconsistent with the views expressed herein.

### DISPOSITION

The judgment of the Court of Appeal is reversed and the matter remanded for further proceedings consistent with this opinion.

George, C. J., Baxter, J., and Chin, J., concurred.

**MORENO, J.,** Concurring.—I agree with the majority that the City and County of San Francisco's (San Francisco) ban on write-in voting in its

---

[8]The brief amici curiae filed in support of defendant provides a sampling of such sentiments. "In *Federalist Paper No. 22,* Alexander Hamilton wrote that governance by the majority is a '. . . fundamental maxim of republican government[,] which requires that [the] sense of the majority should prevail.' Alexander Hamilton, et al., *The Federalist Papers* (Mentor Books 1961) at p. 146. Addressing the inadvisability of requiring a quorum of more than a majority in a legislative assembly, James Madison wrote in *Federalist Paper No. 58,* that '[t]he fundamental principle of free government would be reversed. It would no longer be the majority that would rule . . . .' *Id.* at p. 361. Thomas Jefferson held similar views. In a conversation with President George Washington on February 7, 1793, Jefferson stated that he '. . . subscribe[s] to the principle, that the will of the majority, honestly expressed, should give law. . . .' *The Anas (Notes) of Thomas Jefferson* in Adrienne Koch and William Peden, *The Life and Selected Writings of Thomas Jefferson* (Random House 1944) at p. 130 . . . ."

December 1999 runoff election is constitutional. I arrive at that result through a different route. The majority would overrule *Canaan v. Abdelnour* (1985) 40 Cal.3d 703 [221 Cal.Rptr. 468, 710 P.2d 268, 69 A.L.R.4th 915] (*Canaan*) "to the extent, but only to the extent, it is inconsistent with the views expressed" in the majority opinion. (Maj. opn., *ante*, at p. 183.) The extent to which *Canaan* is overruled by the majority is unclear. I disagree that *Canaan* should be overruled and would instead distinguish it from the present case, as explained below.

As the majority recognizes, the United States Supreme Court's holding that a complete ban on write-in voting does not contravene the First Amendment of the United States Constitution (see *Burdick v. Takushi* (1992) 504 U.S. 428 [112 S.Ct. 2059, 119 L.Ed.2d 245] (*Burdick*)) does not compel the conclusion that such a ban, or even a more limited ban, would pass muster under the California Constitution's free speech clause, article I, section 2, subdivision (a). The meaning of this clause is derived not only from the distinctive text and history of the clause, or from our present discernment of its purposes and contours, but also from previous judicial interpretations of the clause. Thus, our natural starting point for determining whether a write-in ban in runoff elections violates the free speech clause is *Canaan*, which considered a similar, although not an identical, question.

The *Canaan* court adopted into California law the federal constitutional balancing test for evaluating the constitutionality of election law articulated in *Anderson v. Celebrezze* (1983) 460 U.S. 780 [103 S.Ct. 1564, 75 L.Ed.2d 547] (*Anderson*). " 'Constitutional challenges to specific provisions of a State's election laws . . . cannot be resolved by any "litmus-paper test" that will separate valid from invalid restrictions. [Citation.] Instead, a court must resolve such a challenge by an analytical process that parallels its work in ordinary litigation. It must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional. [Citations.] The results of this evaluation will not be automatic; as we have recognized, there is "no substitute for the hard judgments that must be made." [Citation.]' " (*Canaan, supra,* 40 Cal.3d at p. 712, fn. omitted, quoting *Anderson, supra,* 460 U.S. at pp. 789-790 [103 S.Ct. at p. 1570].) Applying this test, the *Canaan* court then invalidated a scheme prohibiting

write-in voting for the San Diego mayoral contest in a general election occurring five months after the primary election.

The majority does not disagree with the test, only its application. In their view, the *Canaan* court gives too much importance to the "expressive function" of voting and not enough importance to what the *Burdick* court identified as " '[T]he function of the election process . . . "to winnow out and finally reject all but the chosen candidates." ' " (Maj. opn., *ante*, at p. 181, quoting *Burdick, supra,* 504 U.S. at p. 438 [112 S.Ct. at p. 2066].) Because the *Canaan* court overvalued this expressive function, the majority concludes, it correspondingly undervalued a local government's legitimate interest in having a winning candidate chosen by a majority of the voters. This analysis has an appealing simplicity. But as majority itself seems to recognize at points, it is overly simple.

Although the *Canaan* court, to be sure, articulated an interest in the "expressive function" of write-in voting, it addressed another concern more fundamental to the basic purpose of the electoral process. In *Canaan,* the petitioner sought to advance his write-in candidacy for the general mayoral election after one of the two candidates who had qualified for that election, the incumbent mayor, was indicted for numerous felonies. (*Canaan, supra,* 40 Cal.3d at pp. 708-709.) This predicament was central to the *Canaan* court's holding: "If the candidate who has represented an individual's interests and views is forced to withdraw from the campaign, alters his or her positions or is indicted for alleged felonies, [an] individual may feel compelled to become a candidate in order to fill the void. Rather than 'doing violence' to the election process, the availability of a write-in candidacy provides the flexibility to deal with unforeseen political developments and *may help ensure that the voters are given meaningful options on election day."* (*Id.* at pp. 718-719, italics added.) Stated in other terms, "it is possible that the ban on write-in voting in this case may have prevented the election of a candidate who enjoyed the support of the majority of . . . voters." (*Id.* at p. 722, italics omitted.)

While the relative importance of the "expressive function" of voting is debatable, the importance of preventing this kind of widespread disenfranchisement is not. Moreover, as the majority recognizes, the very election we are considering, the San Francisco mayoral election of 1999, is a testimony to the power of a write-in candidacy. One of the candidates who qualified for the runoff election, Tom Ammiano, was himself a write-in candidate.

Thus, one of the essential concerns of *Canaan,* as it was of the dissent in *Burdick,* is not just that voters will be unable to express dissident views

through write-in votes, but that potentially large numbers of voters will be effectively *disenfranchised*, deprived of "the opportunity to cast a meaningful ballot." (*Burdick, supra*, 504 U.S. 428, 447 [112 S.Ct. 2059, 2070] (dis. opn. of Kennedy, J.).) In *Burdick*, the dissent identified this threat of disenfranchisement as coming from Hawaii's total ban on write-in voting combined with other ballot restrictions and the one-party system then virtually in effect in that state. (*Id.* at pp. 446-448 [112 S.Ct. at pp. 2070-2071].) In *Canaan*, the primary/general election scheme, which narrowed the field to two candidates in the general election, combined with the write-in ban, deprived a large number of voters of a meaningful choice when circumstances turned one of the candidates into an indicted felon. Such disenfranchisement "strike[s] at the heart of representative government." (*Reynolds v. Sims* (1964) 377 U.S. 533, 555 [84 S.Ct. 1362, 1378, 12 L.Ed.2d 506].)

Against this interest in preventing widespread disenfranchisement, the majority evokes a countervailing state interest in ensuring that the winning candidate obtains a majority of votes cast. As the majority recognizes, this interest, while not illegitimate, is not very substantial. Indeed, all of our nonmunicipal elections—for President, the United States Congress, for California statewide office and for the California Legislature—have no such voter-majority requirement. It has been proven time and again that elected representatives can function effectively in a democracy even if they were elected by less than a majority of the votes cast. And although the majority quotes James Madison, Alexander Hamilton and other of this country's founders as generally endorsing the importance of majority governance (maj. opn., *ante*, at p. 183, fn. 8), the requirements of election by a majority of voters is nowhere found in the Constitution they helped draft and ratify.

Moreover, the goal of achieving a voter majority can often, if not always, be achieved without a write-in ban. The restriction on the number of candidates on the ballot to two in a runoff election, as mandated by Proposition D (S.F. Charter, former art. XIII, § 13.102, repealed Mar. 5, 2000), will generally ensure that the winning candidate obtains a majority of votes cast without such a ban. This is because write-in candidates generally do not receive a high proportion of the vote, perhaps because of the inconvenience of casting write-in votes and the marginal political position that write-in candidates usually occupy. For example, the March 5, 2002, San Francisco election results that we judicially notice (see maj. opn., *ante*, at p. 171, fn. 3) reveal that in contested elections the write-in votes virtually never exceeded 2 percent, and in most cases even 1 percent, of the votes cast. Therefore, unless there is deep and widespread discontent among voters with the two qualifying candidates for municipal elections and/or a very close election, write-in candidates usually will not prevent the winning candidate from

obtaining a majority. Indeed, the amici curiae brief by the Cities of Los Angeles, Monterey and Redlands in support of San Francisco acknowledges that none of these three cities have banned write-in voting in runoff elections and that only five of 105 charter cities have, to their knowledge, enacted such a ban. The fact that runoff elections can generally perform their "winnowing" function without prohibiting write-in voting makes the City's interest in such prohibition that much less compelling.

Nonetheless, a write-in ban in runoff elections is not without justification. Given that municipal elections in California are nonpartisan (Cal. Const., art. II, § 6), the major political parties are not able to perform their traditional function of choosing a single candidate to represent them in the general election and of organizing voting constituencies, thereby reducing voter fragmentation. (See Pomper, The Contributions of Political Parties to American Democracy in Party Renewal in America in Theory and Practice (1980) pp. 5-6 [political parties serve to aggregate diverse interests].) The advocates of Proposition D expressed concern that San Francisco mayors were being or could be elected by "a very small minority of the voters—even a scant twenty percent or less." (S.F. Ballot Pamp., Gen. Mun. Elec. (Nov. 6, 1973) pp. 60-61.) In other words, a municipality with a history of political fractiousness may legitimately conclude, as San Francisco has, that without a write-in ban, severe voter fragmentation may persist into the runoff stage of a nonpartisan election, leading to the selection of mayoral candidates who are less able to govern because they have received a small proportion of the vote. Stated in these terms, San Francisco's interest in preventing this type of fragmentation appears somewhat weightier than the mere abstract interest in having a winning candidate receive 50 percent or more of the vote.

Therefore, we have on one hand, the potential that a write-in ban will severely impact the electorate's ability to choose viable candidates, particularly when circumstances change drastically after a qualifying election, and on the other hand, San Francisco's legitimate if not compelling interest in having its candidates elected by a majority of votes cast. Balancing these interests, I conclude that in this case, unlike in *Canaan*, the balance tips in favor of upholding the write-in prohibition, because the potential for disenfranchisement due to changed circumstances between the first and second elections is diminished by the brevity of the interval between them. Simply stated, the possibility of changed circumstances that would effectively eliminate one of the two chosen candidates is significantly smaller within the six-week period at issue in this case than within the five-month period at issue in *Canaan*.

Furthermore, as stated above, a court " 'must not only determine the legitimacy and strength of each of [the state's] interests; it also must

consider the extent to which those interests make it necessary to burden the plaintiff's rights.'" (*Canaan, supra,* 40 Cal.3d at p. 712, quoting *Anderson, supra,* 460 U.S. at pp. 789-790 [103 S.Ct. at p. 1570].) In *Canaan,* we indicated that a write-in ban might be justified by the "'important and legitimate interest in voter education'" (*Canaan, supra,* 40 Cal.3d at p. 720) but that prohibiting write-in candidates who did not enter the contest more than five months prior to the general election was excessive: "'"Given modern communications, and given the clear indication that campaign spending and voter education occur largely during the month before an election"' ([*Anderson, supra,* 460 U.S.] at p. 797 [75 L.Ed.2d at p. 563] . . .) it is unnecessary to impose a cutoff date some five months before the general election." (*Canaan, supra,* 40 Cal.3d at p. 720; see also *Anderson, supra,* 460 U.S. 780, 797-798 [103 S.Ct. 1564, 1574-1575] [excessive to require filing for Ohio's presidential ballot seven months before the election].) In light of the recognition in *Canaan* and *Anderson* that most campaign activity occurs in the month prior to an election, and in light of the practical realities of mounting an election campaign, San Francisco's six-week period between the general and runoff elections seems close to the minimum necessary for a meaningful campaign in which the two qualifying candidates can be closely scrutinized. It would be an exercise in judicial overreaching for a court to insist on a shorter interval.

I therefore conclude that the election scheme at issue in this case, by minimizing the interval between the general and runoff elections, burdens the electorate's interest in choosing candidates of choice no more than is reasonably necessary to accomplish the legitimate goal of reducing voter fragmentation. In this respect, it differs significantly from the election scheme at issue in *Canaan.* On that basis, and without overruling *Canaan,* I would hold that San Francisco's write-in prohibition in runoff elections is constitutional.

Kennard, J., and Werdegar, J., concurred.

Appellants' petition for a rehearing was denied January 15, 2003.