[No. E035533. Fourth Dist., Div. Two. July 20, 2005.]

THE PEOPLE, Plaintiff, v.
NORMAN DAVID STARK et al., Defendants;
BYRON Z. MOLDO, as Receiver, etc., Movant and Respondent;
KANE AUTOMOTIVE GROUP, Appellant;
SHAVER AUTOMOTIVE GROUP, LLC Respondent.

COUNSEL

Kane Law Firm, Brad S. Kane and Michael F. Will for Appellant.

Pachulski, Stang, Ziehl, Young, Jones & Weintraub and Larry W. Gabriel for Movant and Respondent.

No appearance for Respondent.

OPINION

KING, J.—

## INTRODUCTION

Appellant Kane Automotive Group (Kane) appeals from the trial court's February 6, 2004, orders concerning a sale of assets by court-appointed receiver, Byron Z. Moldo, Esq. (Moldo). In the orders, the trial court denied Moldo's motion to approve a sale to Kane of the assets of an auto dealership (the Kia dealership assets) following a public auction of the assets, voided Kane's contractual right to match the highest bid received at auction, directed Moldo to conduct a second auction, and confirmed a sale of the Kia dealership assets to the highest bidder at the second auction, Shaver Automotive Group, LLC (Shaver). We affirm the trial court's orders.

## SUMMARY OF FACTS AND PROCEDURAL HISTORY

Moldo was appointed receiver of the assets and properties of Norman David Stark (Stark) and Stark's wholly owned corporation, JPS Corporation (JPS), pursuant to Penal Code section 186.11.[1] Kane offered to purchase certain assets of the receivership, specifically, the Kia dealership assets, including the dealership's franchise or "blue sky" value. Moldo entered into an agreement to sell the Kia dealership assets to Kane. The purchase price was $150,000 for the franchise, plus an additional amount for the dealership's other assets, including parts, tools, and other items. Kane was apparently the first to offer Moldo any amount for the Kia dealership assets. Accordingly, Kane's offer was referred to as the "stalking horse bid."

Moldo's agreement with Kane was subject to court approval and overbids at an auction, that is, bids in excess of $150,000 for the franchise, plus the additional amount Kane had offered for the Kia dealership's other assets. The

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

purchase agreement also provided that Kane had a right to match the highest overbid following the auction. In other words, Kane had a right to match the highest overbid after the auction concluded, and the other bidders did not have a right to meet or exceed Kane's matching bid. This contingency was referred to as Kane's "bid matching right" or right of first refusal.

Moldo conducted an auction for overbids without first seeking court approval of the purchase agreement with Kane or Kane's bid matching right. However, the bidders were informed of Kane's bid matching right before and during the initial auction. The bidders were further informed that Moldo had filed a motion to approve the sale to Kane subject to overbids and Kane's right to match the highest overbid. The initial auction was held on January 16, 2004. Kane did not participate in the bidding. Another bidder, O'Brien Automotive Group (O'Brien), was the highest bidder for the Kia dealership's franchise at $490,000. O'Brien also offered to purchase more of the dealership's other assets than Kane had offered to purchase, and at prices equal to or exceeding Kane's original offer. After the bidding concluded, Kane matched O'Brien's bid of $ 490,000 for the franchise, plus the same amount O'Brien had offered to pay for the dealership's other assets. Moldo accepted Kane's matching bid. O'Brien immediately offered $550,000 for the Kia dealership's franchise, or $60,000 more than Kane's matching bid, but Moldo took the position that the bidding had closed.

Following the initial auction, O'Brien and other bidders, including Shaver, filed written objections to Moldo's motion to approve the sale to Kane, and appeared at the hearing on the motion on February 6, 2004. The objectors argued that Kane's bid matching right suppressed the bidding and prevented Moldo from obtaining the highest value for the assets. Shaver raised an additional concern regarding the conduct of the auction. Shaver argued that Moldo should have auctioned the Kia dealership assets in combination with the real estate on which the dealership was located, and that selling the assets as a package would result in a higher sales price to the receivership. Indeed, at the initial auction, Shaver offered $590,000 for the Kia franchise, $100,000 more than Kane's matching bid of $490,000 and $40,000 more than O'Brien's postauction bid of $550,000, conditioned on Shaver being the successful bidder at Moldo's subsequent auction for the real estate.

At the hearing on Moldo's motion to approve the sale to Kane, Moldo's counsel suggested that a new auction should be conducted. Kane argued that it had provided value to the receivership by being the first to offer any amount for the Kia dealership assets, and that its bid matching right should therefore be enforced. After hearing the arguments of the objectors, Moldo, and Kane, the trial court denied Moldo's motion to approve the sale to Kane, voided Kane's bid matching right, and ordered a second auction. At the

second auction, the trial court directed Moldo to auction the Kia dealership assets first, then the real estate, then both as a package.

The second auction took place in the courtroom immediately after the hearing on February 6, 2004. O'Brien was the highest bidder for the Kia dealership assets at $670,000 for the franchise, beating Kane's next highest bid of $650,000.[2] The highest bid for the real estate alone was $3.65 million. Shaver was the highest bidder for the assets as a package at $4.882 million. Thus, Shaver's bid exceeded the highest bids for the assets auctioned separately by over $1 million. Immediately after the second auction, the court approved the sale of the Kia dealership assets and the real estate to Shaver. Kane appealed from the trial court's February 6, 2004, orders.

## SUMMARY OF ISSUES ON APPEAL

We first address an issue we raised following Kane's filing of its notice of appeal: whether Kane has standing to appeal the trial court's orders. We conclude that Kane has standing to appeal. In short, Kane had a contractual right to purchase the Kia dealership assets, subject to court approval, and Kane's contractual right was adjudicated in the trial court, adversely to Kane. Because the trial court's orders are binding on Kane, and Kane is aggrieved by the orders, Kane has standing to appeal the orders. We next address a second procedural issue: whether, as Moldo contends, this appeal is moot because Moldo has sold the Kia dealership assets to Shaver. Based on the record before us, we conclude that this appeal is not moot. Moldo has not shown that all of the assets subject to the receivership have vested in Shaver, or that Kane would have no remedy whatsoever if it prevailed on this appeal.

We then turn to Kane's contentions on this appeal. First, Kane contends that the trial court abused its discretion in disapproving the sale to Kane following the first auction, because the trial court erroneously considered only whether a second auction would result in a higher sales price for the receivership. Kane argues that the trial court should have also considered the benefit to the receivership of Kane's initial "stalking horse bid." We conclude that the trial court acted within its discretion in disapproving the sale to Kane, voiding Kane's bid matching right, ordering the second auction, and approving the sale to Shaver.

Second, Kane contends that its procedural due process rights were violated because it was not given adequate notice that a second auction would be held immediately following the February 6 hearing. Kane further argues that it

---

[2] All bidders agreed to pay $1.414 million for the Kia dealership's other assets, less adjustments.

was not given adequate notice that Moldo would change its position at the hearing and concede that a second auction should be held. We reject Kane's procedural due process arguments, because Kane had sufficient reason to expect that a second auction would be held immediately after the February 6 hearing, if the court did not approve the sale to Kane at that hearing. Moreover, Kane did not object to the second auction being held immediately after the hearing and participated in the second auction.

## FACTS AND PROCEDURAL HISTORY

On October 16, 2003, Stark and other defendants were charged with felony grand theft and conspiracy, based on their operation of a check-kiting scheme. The scheme allegedly caused First Bank of Palm Desert (First Bank) to lose over $3 million, and was allegedly perpetrated to keep Stark's two automobile dealerships operational. In November 2003, Stark pleaded guilty to felony grand theft and conspiracy, and admitted an "aggravated white collar crime enhancement." (§§ 186.11, subd. (a)(2), 1203.045 & 12022.6, subd. (a)(2).)

On October 20, 2003, the People applied for and Stark stipulated to an order appointing Moldo temporary receiver pursuant to section 186.11. The order directed Moldo to take possession of the assets of Stark and his wholly owned entity, JPS. JPS owned and operated two automobile dealerships, a Kia dealership and a Mazda dealership. Both dealerships were located on land Stark owned in La Quinta. Moldo took possession of the assets and was later appointed permanent receiver.

The assets of the dealerships included franchise rights or "blue sky" value, new and used car inventories, parts, special tools, furniture, equipment, and signage. The dealerships owed approximately $1.6 million to a flooring financier, Primus Financial, had outstanding accounts payable in excess of $500,000, and owed over $200,000 to the Franchise Tax Board. The dealerships had also failed to make installment payments on a forbearance agreement with First Bank. Stark acknowledged owing First Bank $3.8 million. The real estate was appraised at $5 million and was encumbered by over $6.5 million in liens. Real estate taxes were also due.

On October 29, 2003, Moldo applied for and the court issued an order authorizing Moldo to cease operating the dealerships due to a shortage of operating cash and because the dealerships were unprofitable. On or about November 6, Moldo ceased operating the dealerships.

On December 10, 2003, the court issued a further order authorizing Moldo to sell both dealerships and the real property, subject to court "confirmation

and ultimate approval" and an overbid process. Moldo was directed to take reasonable steps to market the properties "for sale at the best and highest price available." The order further stated: "[W]hen an acceptable offer is presented, the Receiver shall file a motion with the Court to confirm the agreement. On the day of the confirmation hearing, the Receiver will request over-bids based upon the offer presented. Any over-bid must be in increments of $20,000. At the end of the process, the highest and best bid will be presented to the Court for confirmation. It is contemplated that all persons with whom the Receiver had received offers or inquiries will receive notice of the confirmation hearing."

Moldo solicited bids for the assets, and received approximately 30 inquiries for the dealerships and real property. On December 26, 2003, Kane submitted an offer to purchase the Kia dealership franchise for $150,000, plus additional sums for some, but not all, of the dealership's other assets. For example, the offer did not include any amount for the Kia dealership's new and used car inventory. The offer was expressly subject to court approval, and provided that Kane would have the right to match any overbid at the anticipated overbid auction (the bid matching right or the right of first refusal). The offer was also conditioned on the franchisor's approval of the franchise transfer to Kane and the franchisor's approval of a new location for the Kia dealership. Moldo and Kane entered into a purchase agreement pursuant to the terms and conditions set forth in the offer.

On December 31, 2003, Moldo filed a motion seeking court approval of the Kane offer and purchase agreement, subject to the court-ordered overbid process. The hearing was originally set for January 16, 2004. In the motion, Moldo advised that he was giving notice of the hearing to all parties who had expressed an interest in the Kia dealership's assets. To qualify as a bidder, a party was required to submit a written offer no later than three days before the hearing. The offer was required to exceed Kane's offer by at least $20,000, and was required to be for the same or more assets listed in Kane's offer. Moldo further advised that the overbid auction was to be held at the court and immediately before the January 16 confirmation hearing. Moldo stated that "[a]fter receiving the final bids," he would "present to the Court for confirmation the highest bid for further consideration and approval." In Moldo's moving papers, there was no mention of Kane's bid matching right or right of first refusal. In early January 2004, Moldo entered into an agreement with Mazda Motors of America, Inc. (MMA) to sell the Mazda dealership to MMA for $150,000. This agreement was also subject to court approval and an overbid process. A motion to approve this sale was also set for hearing on January 16.

On November 20, 2003, Kia Motors America, Inc. (KMA), the franchisor of the Kia dealership, issued a notice of termination of the Kia dealership

franchise.[3] On December 4, Moldo advised KMA that the court's initial order appointing him receiver included a temporary restraining order which effectively prohibited KMA from terminating the Kia franchise without advance court approval. The trial court's December 10 order authorizing Moldo's sale included an injunction that generally prohibited persons in possession of the assets of Stark or JPS from transferring or otherwise disposing of the assets. On December 19, KMA filed a motion seeking clarification of whether the court's temporary restraining order or preliminary injunction prohibited KMA's termination of the Kia franchise. Moldo opposed the motion on the ground the court's temporary restraining orders and injunction prohibited the termination, and on the further ground that the hearing to approve the sale of the Kia dealership to Kane was set for January 16. Based on the prospective sale, Moldo argued that KMA should not be allowed to terminate the Kia dealership franchise at that time. The trial court enjoined KMA from terminating the franchise, pending Moldo's auction and sale of the franchise.

On January 16, 2004, at 9:00 a.m., the court continued the confirmation hearings to 1:30 p.m. at Moldo's request so that Moldo could conduct overbid auctions. Moldo then conducted separate auctions of (1) the Kia dealership assets, (2) the Mazda dealership assets, and (3) the La Quinta real estate. The auctions took place at the dealerships' La Quinta location. Six qualified bidders were present, including Kane, Shaver, O'Brien, and three others. Other interested parties were also present, including counsel for Stark and representatives of Stark's and JPS's creditors.

Before the auctions began, Moldo advised the bidders that, immediately after the auctions were completed that afternoon, he would seek court approval of the sales of the Kia dealership assets and Mazda dealership assets to the highest bidder. Moldo also advised that he would be accepting bids on the real estate and would soon file a motion to confirm that sale on a later date, subject to overbidding. One of the bidders questioned whether Moldo would be accepting bids on the dealerships' assets that were contingent upon being the successful bidder for the real estate. Moldo responded that, if a bidder wanted to make such a bid, it should state the contingency.

Moldo first auctioned the Mazda dealership assets. He solicited bids based on MMA's preauction offer of $150,000 for the franchise, plus a set amount for automobiles, parts, accessories, tools, and other items listed in MMA's offer. Moldo advised that the sale was contingent on MMA approving the transfer of the franchise to the highest bidder, and court approval. O'Brien was the highest bidder at $175,000 for the franchise, plus the set amount for

---

[3] The dealership franchise agreements authorized the franchisors to terminate the franchises in the event the dealerships were not operated for seven days, the dealer-owner was convicted of a felony, the dealership failed to maintain adequate financing, and other grounds.

automobiles and other items. At this auction, no bids were made contingent on purchasing the real estate. MMA subsequently matched O'Brien's highest bid, and during the afternoon of January 16, the trial court approved the sale of the Mazda dealership assets to MMA. This sale is not contested.

Next, Moldo auctioned the Kia dealership assets. He solicited bids based on Kane's offer of $150,000 for the franchise, plus a set amount for parts and other items listed in Kane's preauction offer. Before the bidding began, Moldo advised the bidders that Kane had a right of first refusal or the right to match the successful bidder's overbid. He also advised that the sale was contingent on KMA approving the transfer of the franchise, and court approval.

During the bidding for the Kia dealership assets, Shaver made an initial overbid of $170,000 that was not contingent on its purchase of the real estate. In addition, Shaver offered to purchase items that were not included in Kane's preauction offer, including automobiles. O'Brien and other parties matched Shaver's initial overbid, without the real estate contingency. One party argued that it, like Kane, should be allowed to match the highest overbid, because it submitted an offer at least three days before the auction. Moldo disagreed.

By the end of the bidding, Shaver had offered $590,000 for the Kia franchise, with the real estate contingency. Shaver withdrew its bid, however, after Moldo said Shaver would lose its deposit if it were not the successful bidder on the real estate. O'Brien offered $490,000 for the franchise, without the real estate contingency. Following Shaver's withdrawal, Moldo announced that O'Brien's $490,000 bid was the highest noncontingent offer.

After no one offered $510,000 without the real estate contingency, Kane matched O'Brien's overbid of $490,000. Moldo accepted Kane's matching overbid, subject to court approval. O'Brien immediately offered $550,000 without the real estate contingency, but Moldo said the bidding had closed and it was too late to make an additional bid. O'Brien disputed that the bidding had closed. It was also unclear how Moldo could quantify the difference between the overbids that were made with and without the real estate contingency.

Nevertheless, Moldo announced he would be submitting Kane's $490,000 matching overbid for court approval and that anyone was welcome to attend the court hearing and make their arguments at that time. Moldo also said that, due to the amount of time that had passed, the court confirmation hearing would be rescheduled and all interested parties would be given notice of the continued hearing date.

Moldo next accepted bids for the real estate. O'Brien offered $3.1 million for the real estate alone. Another qualified bidder expressed an interest in buying both franchises and the real estate as a package. Moldo announced that he would be filing a motion to approve the sale of the real estate to O'Brien, subject to overbids, and would be sure to give notice of the hearing on the motion to all interested parties.

At 1:30 p.m., Moldo's counsel returned to court and reported that the auction for the Mazda dealership assets had concluded but the other auctions were in progress. Counsel also reported that MMA had agreed to match O'Brien's bid of $175,000 for the Mazda dealership's franchise or "blue sky" value, plus the additional sum for the automobiles and other items. Counsel said Moldo would be submitting a "stipulated order" for court approval of the sale to MMA. The court indicated it would approve the sale to MMA, based on counsel's representations.

Moldo's counsel then requested that the court continue the hearing on the sale of the Kia dealership assets. Counsel advised that Moldo would be asking the court to approve Kane's $490,000 matching bid, but that he expected the parties to appear at the hearing "to either assert rights or to increase their bids." Counsel also said Moldo would be filing a motion to approve the sale of the real estate. The court ordered additional papers to be filed by January 20, and set confirmation hearings on the sales of the Kia dealership assets and the real estate for January 23.

On January 20, Moldo filed a declaration in support of his motion to approve the sale of the Kia dealership assets to Kane. He explained what had occurred at the auctions of the Kia dealership assets and the real estate, and advised that some of the interested bidders would be objecting to confirmation of the sale to Kane. He also said that Kane had since indicated its desire to purchase the real estate, and that other parties were interested in purchasing the real estate either with or without the Kia dealership assets. He asked the court to make a "final determination" of the "highest and best offer" for the Kia dealership assets and to entertain additional offers for the real estate.

On January 21, Moldo submitted an amended declaration correcting the listing of Kia dealership assets that Shaver, O'Brien, and Kane had agreed to purchase. Moldo's amended declaration was otherwise identical to his January 20 declaration.

On January 22, Shaver filed objections to Moldo's motion to confirm the sale to Kane. Shaver argued that the "piecemeal" auction of the assets had not brought about the highest bid for the assets as a whole. Shaver explained that the real estate could only be used as a car dealership based on applicable

covenants, conditions, and restrictions, and that selling the real estate separately made it "virtually impossible for qualified dealers, such as Shaver, to make a meaningful run at the Kia dealership assets if they cannot know where they will be able to operate their dealership." Shaver further objected that Moldo had no authority to require Shaver to forfeit its deposit if it was the successful bidder on the Kia dealership assets but not on the real estate. In sum, Shaver requested that the court instruct Moldo to auction the Kia dealership assets and real estate together.

On January 23, O'Brien filed objections to the sale to Kane, on the ground that its noncontingent offer of $550,000 for the Kia dealership assets was $60,000 higher than Kane's $490,000 matching bid. O'Brien noted that Kane's "bid matching term" or right of first refusal effectively removed Kane from the bidding and allowed Kane to "sit back and wait" while the other participants bid against each other. O'Brien noted that the court had not approved Kane's bid matching term, and that Moldo did not bring it to the court's attention in his motion to approve the sale to Kane, although the term was included in Kane's offer and proposed purchase agreement, which were attached to the motion. O'Brien argued that the court should disapprove Kane's bid matching term, because it suppressed the value of the assets.

On January 23, Kane filed responses to Shaver's and O'Brien's objections. Kane argued that Shaver had no standing to object because it had withdrawn its $590,000 contingent offer and did not bid on the real estate. Kane also argued that O'Brien knew about Kane's bid matching right before the auction began and was again admonished of it prior to, at the start of, and during the auction, and had made its $550,000 bid after the auction had concluded. Kane further argued that the trial court should approve Kane's purchase of the assets, because Kane had provided "significant value" to the receivership by being the "stalking horse" bidder. Kane also noted that Moldo had successfully opposed KMA's motion to clarify the scope of the court's preliminary injunction and had prevented KMA from terminating the Kia franchise, based on Kane's initial purchase offer.

On January 23, the trial court continued the hearing on Moldo's motion to confirm the sale to Kane to February 6, citing the voluminous documents the court had received from the interested parties. Moldo's counsel requested to speak with the court in chambers, but the court preferred to continue the matter to allow it time to read all the documents that had just been filed. The court set a separate time to speak to Moldo. Moldo's counsel also mentioned that another judge had denied KMA's motion to terminate the franchise, but had indicated that KMA could renew the motion after January 20. The

court ruled that KMA, whose counsel was present in court, could not renew its motion to terminate the franchise until after February 6.[4]

At the continued February 6, 2004, hearing, a number of interested persons were present, including bidders at the January 16 auctions and counsel for several of Stark's and JPS's creditors. Initially, Moldo's counsel noted that the court and Moldo had a duty to obtain the highest amount for the assets, and if the court reopened the bidding he believed higher bids would be forthcoming. The court asked Moldo's counsel to explain the "stalking horse concept" and why Kane was given the right to match the highest bid.

Moldo's counsel explained that "[m]any of us are bankruptcy lawyers, and we often do this in the bankruptcy forum." Counsel said that in the bankruptcy forum, initial bidders often require a "breakup fee" as a condition for making an initial offer.[5] Here, instead of negotiating a breakup fee, Kane conditioned its offer on having the right to match the highest bid, and Moldo agreed to it. Counsel explained it was possible that the bidding would be so high that Kane would no longer participate, in which case Kane would not exercise its right to match the highest bid and would not receive a breakup fee.

The trial court questioned whether a party should have a right to match the highest bid in a section 186.11 receivership auction. Various counsel noted that the court had not approved Kane's bid matching right before the auction, and that it had suppressed the bidding. O'Brien's counsel asked the court to order a new auction without Kane's bid matching right. Shaver explained why it made its bid contingent on purchasing the real estate, and asked the court to order a new auction of the assets as a package. Other parties joined in requesting a new auction. KMA's counsel stressed the urgency of completing a sale so that Kia customers would no longer have to travel great distances to have their cars serviced.

Kane's counsel argued, in defense of Kane's bid matching right, that Kane's initial $150,000 "stalking horse" bid probably prevented the loss of the Kia franchise to KMA. Counsel said Kane had copied the right from MMA's stalking horse bid for the Mazda dealership assets, and argued that the ground rules of the auction were clear from the beginning. Counsel also noted that Kane would not be bidding on the real property, because it knew it would be outbid. Counsel complained that, before that day, he and his client

---

[4] Following the continuance to February 6, additional objections and responses to objections were filed.

[5] "A break-up fee, or more appropriately a termination fee, is an incentive payment to a prospective purchaser with which a company fails to consummate a transaction." (*In re Integrated Resources, Inc.* (Bankr. S.D.N.Y. 1992) 147 B.R. 650, 653.)

were unaware that Moldo would be taking "the position of almost inviting the court to let the receiver out of the agreement" with Kane. And, without knowing in advance that a new auction would be ordered, counsel argued that Kane was "handicapped" in its ability to bid more for the Kia dealership assets than it had previously bid.

Moldo's counsel and several others suggested that a new auction be conducted in three stages: (1) the Kia dealership assets alone, (2) the real estate alone, and (3) the Kia dealership assets and real estate together. The court agreed. Thus, the court: (1) denied the motion to approve the sale to Kane, (2) ruled that Kane would not have the right to match the highest bid on the Kia dealership assets, and (3) ordered a new auction.

The new auction was conducted in the courtroom immediately after the court disapproved the sale to Kane. The bidding for the Kia dealership assets began at $490,000 for the franchise or blue sky value alone. The price of all other Kia dealership assets was fixed at $1.414 million, less a 5 percent price adjustment for the automobiles. Bidding was in $20,000 increments. Kane bid up to $650,000. O'Brien was the highest bidder for the franchise alone at $670,000. Next, the real property was auctioned. The highest bid was $3.5 million from Mr. Gindi.[6] Lastly, the Kia dealership assets and the real property were auctioned together. The bidding began at $4.17 million, which reflected $670,000 for the franchise and $3.5 million for the real property. Again, it was understood that the winning bidder would pay an additional $1.414 million for the remaining Kia dealership assets, less a 5 percent price adjustment for the automobiles. Bidding was in $50,000 increments. Kane did not participate in this bidding. Shaver submitted the highest bid at $4.82 million for the Kia franchise and real estate.

At 4:45 p.m., Moldo asked the court to approve Shaver's purchase of the combined assets for $6.234 million. This price reflected Shaver's winning bid of $4.82 million, plus $1.414 million for the remaining Kia dealership assets. The court approved the sale to Shaver. The final purchase price, net of the 5 percent price adjustment, was $6,169,700.

On February 18, 2004, Kane applied to this court for a writ of mandate in case No. E035312, requesting that we stay the trial court's February 6, 2004, orders and direct the trial court to enter an order approving the sale to Kane. On February 27, we summarily denied the writ petition.[7] On March 4, Kane filed a notice of appeal from the court's February 6, 2004, orders.

---

[6] Mr. Gindi later increased his bid to $3.65 million for the real estate alone.

[7] On April 30, 2004, we granted Moldo's request that we take judicial notice of the entire contents of the file in case No. E035312.

## DISCUSSION

### A. *The Record Does Not Demonstrate That the Issues on Appeal are Moot*

Moldo contends that this appeal is moot because (1) Moldo sold the Kia dealership assets to Shaver shortly after February 6, 2004, (2) Kane failed to post an appeal bond staying the orders, and (3) Kane failed to obtain a writ of mandate staying the orders. Based on the record before us, we disagree that the appeal is moot. Moldo has not shown that postjudgment events have caused issues to become moot. (*Reserve Insurance Co. v. Pisciotta* (1982) 30 Cal.3d 800, 813 [180 Cal.Rptr. 628, 640 P.2d 764].)[8] Nor has Moldo shown that Kane cannot be granted any effective relief, through no fault of Moldo, should Kane prevail on this appeal. (*Consol. etc. Corp. v. United A. etc. Workers* (1946) 27 Cal.2d 859, 863 [167 P.2d 725].) In any event, the issues on this appeal are of broad public importance and are likely to recur in similar public auctions. Accordingly, we exercise our discretion to resolve the issues on this appeal. (*Edelstein v. City and County of San Francisco* (2002) 29 Cal.4th 164, 172 [126 Cal.Rptr.2d 727, 56 P.3d 1029].)

### B. *Kane Has Standing to Appeal the Trial Court's February 6, 2004, Orders*

Following Kane's filing of its notice of appeal, we requested and Kane submitted a letter brief explaining why Kane has standing to appeal the trial court's orders. Moldo responded in a letter brief that Kane does not have standing to appeal. We deferred ruling on the standing issue together with this appeal. As we explain, Kane has standing to appeal because it is both bound and aggrieved by the trial court's orders.

■ Standing to appeal is jurisdictional (*Marsh v. Mountain Zephyr, Inc.* (1996) 43 Cal.App.4th 289, 295 [50 Cal.Rptr.2d 493]) and liberally construed (*In re Matthew C.* (1993) 6 Cal.4th 386, 394 [24 Cal.Rptr.2d 765, 862 P.2d 765]). Code of Civil Procedure section 902 provides: "Any *party aggrieved* may appeal in the cases prescribed in this title." (Italics added.) ■ Generally, only parties of record may appeal. (*County of Alameda v. Carleson* (1971) 5 Cal.3d 730, 736 [97 Cal.Rptr. 385, 488 P.2d 953].) However, a nonparty has standing to appeal a judgment or order to which the nonparty is bound under the doctrine of res judicata. (*Marsh v. Mountain Zephyr, Inc., supra,* at p. 295.) The doctrine of res judicata prevents persons and their

---

[8] Moldo has requested that we take judicial notice of a document entitled "property transfer record" which purports to show that Moldo transferred the La Quinta real estate to Shaver on March 3, 2004. We deny this request, because the document is not a proper subject of judicial notice. (Evid. Code, §§ 452 & 459.) In any event, the document does not show that the Kia dealership assets, which Kane claims a right to purchase, were transferred to or have vested in Shaver.

privies from relitigating in a subsequent proceeding claims that were or should have been adjudicated in a prior proceeding. (*Lucido v. Superior Court* (1990) 51 Cal.3d 335, 341 [272 Cal.Rptr. 767, 795 P.2d 1223].) Further, to be sufficiently *aggrieved* by the judgment or order, the appellant's rights or interests must be injuriously affected in an " ' "immediate, pecuniary, and substantial" ' " way, as opposed to being a " ' "nominal or a remote consequence" ' " of the judgment or order. (*County of Alameda v. Carleson, supra,* at p. 737; accord, *Ajida Technologies, Inc. v. Roos Instruments, Inc.* (2001) 87 Cal.App.4th 534, 540 [104 Cal.Rptr.2d 686]; see also *United Investors Life Ins. Co. v. Waddell & Reed, Inc.* (2005) 125 Cal.App.4th 1300, 1304 [23 Cal.Rptr.3d 387].)

Kane is not a party of record in these proceedings; however, it is bound by the trial court's orders under the doctrine of res judicata. The motion to approve the sale of the Kia dealership assets to Kane was the proper proceeding for adjudicating Kane's right to purchase the Kia dealership assets, and Kane's right was, in fact, adjudicated in that proceeding. Kane is also sufficiently aggrieved by the trial court's orders, because they immediately deprived Kane of its rights under the purchase agreement. Under the purchase agreement, Kane had a right to purchase the Kia dealership assets, subject to court approval, because Kane matched O'Brien's highest bid following the first auction. Kane's loss of this right was substantial and pecuniary, and not merely a nominal or remote consequence of the trial court's orders.

Kane is no less aggrieved because the purchase agreement was subject to court approval. In *Estate of Bradley* (1914) 168 Cal. 655, 657 [144 P. 136], the probate court refused to confirm a sale to a nonparty who had signed a contract of sale that was subject to court confirmation. The nonparty was recognized as an aggrieved party with the right to appeal the order refusing to confirm the sale. (*Ibid.*) Similarly, in *Estate of Leonis* (1902) 138 Cal. 194, 197 [71 P. 171], the highest bidder in a probate sale was recognized as an interested party, even though the sale to that party was subject to court approval. The court reasoned that the bidder was responsible for his bid, and "might have been compelled to stand by it." (*Ibid.*)

Thus, a prospective purchaser who has performed its obligations pursuant to a binding executory contract has standing to appeal an order refusing to approve the contract or confirm a sale pursuant to the contract. In contrast, a prospective purchaser who is merely outbid for the property does not have standing to appeal an order confirming a sale to the higher bidder. (*Estate of Cahoon* (1980) 101 Cal.App.3d 434, 437–438 [161 Cal.Rptr. 651].) The outbid person has, at best, a *prospective* interest in the property when bidding for it, and his interest in the property and the proceeding terminates

upon his being outbid. (*Ibid.*; accord, *In re Pacific Std. Life Ins. Co.* (1992) 9 Cal.App.4th 1197, 1200–1201 [12 Cal.Rptr.2d 50] [lower bidder had no cognizable interest in property and was no more than offeror]; cf. *Solis v. Vallar* (1999) 76 Cal.App.4th 710, 713–714 [90 Cal.Rptr.2d 677] [half-owner of property had standing to appeal order approving partition sale, even though he was outbid at partition sale; terms of sale approved by court directly affected his interest].)

Here, Kane is not merely an outbid bidder with an inchoate interest in the property or proceedings. Rather, Kane's standing to appeal rests on its purchase agreement with Moldo and on its performance of its obligations pursuant to the agreement. Kane therefore has standing to challenge the trial court's orders.

*C. The Trial Court Did Not Abuse Its Discretion in Disapproving the Sale to Kane, Voiding Kane's Bid Matching Right, Ordering a Second Auction, and Approving the Sale to Shaver*

Kane contends that the trial court abused its discretion in denying Moldo's motion to approve the sale to Kane, because it failed to properly balance all relevant considerations. In refusing to confirm the sale to Kane following the initial auction, Kane argues that the trial court erroneously considered only one issue—whether the receivership would receive a higher purchase price at a new auction—and erroneously failed to also consider the valuable contribution that Kane's initial stalking horse bid made to the receivership. Kane maintains that the value of Kane's contribution required the trial court to confirm the sale to it.

More specifically, Kane argues that its initial bid for the Kia dealership assets provided value to the receivership by (1) generating interest in the Kia dealership assets before the initial auction and establishing a base price at that auction, and (2) providing Moldo with grounds to oppose KMA's motion to terminate the Kia franchise pending the sale of the assets. Without its initial bid, Kane argues, it is probable that Moldo would not have been able to realize any value for the Kia dealership assets.

■ We conclude that the trial court did not abuse its discretion in refusing to approve the sale to Kane. As we explain, a trial court has broad discretion in determining whether to approve or disapprove a receiver's sale of assets. In exercising its discretion, the trial court must balance the need to maximize the price to the receivership against the rights or reasonable expectations of all other interested persons, on a case-by-case basis.

Our analysis of this issue requires a detailed explanation of the law applicable to receivership sales. We first explain the authority and purpose for appointing receivers under section 186.11. We then turn to an analysis of the law applicable to receivership sales in civil actions, and explain why the trial court did not abuse its discretion in refusing to confirm the sale to Kane, voiding Kane's bid matching right, and ordering a second auction, and approving the sale to Shaver.

### 1. Section 186.11 Receiverships

■ Where a defendant is charged with having committed two or more related felonies involving fraud or embezzlement, a pattern of related felony conduct, and the taking of more than $100,000, the defendant may also be charged with an "aggravated white collar crime enhancement." (§ 186.11, subd. (a).) If found true or admitted, the enhancement subjects the defendant to an additional prison term of one to five years, paying restitution to the defendant's victims, and fines. (*Id.*, subds. (a)–(d); § 12022.6, subds. (a)–(b).)

After the specified felonies and enhancement are charged, the superior court is authorized to "preserve" or freeze the defendant's assets and properties pending the outcome of the criminal proceeding in order to pay restitution and fines. (§ 186.11, subd. (e).) Hence, section 186.11 is sometimes referred to as the "Freeze and Seize Law." (*People v. Green* (2004) 125 Cal.App.4th 360 [22 Cal.Rptr.3d 736].)

■ A section 186.11 proceeding is "pendent" to the defendant's criminal proceeding and is to be "maintained solely to effect the criminal remedies [the payment of restitution and fines] provided for in [section 186.11]." (§ 186.11, subd. (e)(2).)[9] The prosecuting agency commences a section 186.11 proceeding by petitioning the superior court for a temporary restraining order, preliminary injunctive relief, the appointment of a receiver, or for any other relief necessary to preserve the defendant's assets and properties, pending the outcome of the criminal proceeding. (*Id.*, subd. (e)(2).) The court may authorize the receiver to "take possession of, care for, manage, and operate the assets and properties . . . ." (*Id.*, subd (f)(2).) The court may also order an interlocutory sale of property upon noticed motion if the property is liable to perish, waste, be significantly reduced in value, or when

---

[9] Section 186.11 further provides that "a notice regarding the petition" shall be provided "to every person who may have an interest in the property specified in the petition," and that any interested person may file a verified claim stating the nature and amount of their claimed interest. (§ 186.11, subd. (e)(3).) Additionally, no preliminary injunction may be granted or receiver appointed without notice to all known and reasonably ascertainable interested parties and upon a hearing to determine that such an order is necessary to preserve the property pending the outcome of the criminal proceeding. (*Id.*, subd. (g)(1).)

the expenses of maintaining the property are disproportionate to its value. (*Id.*, subd. (g)(7).)

■ Following the defendant's conviction or admission of the specified felonies and aggravated white collar crime enhancement, the assets and properties of the receivership may be levied upon and liquidated to pay the restitution and fines. (§ 186.11, subds. (i)–(j).) The receiver and any holders of valid liens, mortgages, or security interests are entitled to priority in payment over persons entitled to restitution and fines. (*Id.*, subd. (j).) Where property is to be levied upon following the defendant's conviction or admission (*id.*, subd. (i)), the receiver "shall be empowered to liquidate all property or assets . . ." (*id.*, subd. (j)).

### 2. *Sales by Receivers in Civil Actions*

■ No case law has been developed concerning sales by receivers appointed pursuant to section 186.11, since the statute was enacted in 1996. Nevertheless, we are satisfied that the law governing sales by receivers appointed in civil actions (Code Civ. Proc., § 564 et seq.) should also govern sales by receivers appointed pursuant to section 186.11.

In a civil action, a receiver is an agent and officer of the court, and property in the receiver's hands is under the control and continuous supervision of the court. (*Lesser & Son v. Seymour* (1950) 35 Cal.2d 494, 499 [218 P.2d 536] (*Lesser & Son*); accord, *Gold v. Gold* (2003) 114 Cal.App.4th 791, 806 [8 Cal.Rptr.3d 118]; Code Civ. Proc., § 568.)[10] "[T]he importance of the trial court's role in supervising a receiver cannot be understated. 'The receiver is but the hand of the court, to aid it in preserving and managing the property involved in the suit for the benefit of those to whom it may ultimately be determined to belong.' [Citations.]" (*Marsch v. Williams* (1994) 23 Cal.App.4th 238, 248 [28 Cal.Rptr.2d 402].) In a civil action, a sale of real or personal property by a receiver is not final until confirmed by the court. (Code Civ. Proc., § 568.5.)[11] Nor is the court bound by a receiver's unauthorized agreement. (*Nulaid Farmers Assn. v. LaTorre* (1967) 252 Cal.App.2d 788, 793 [60 Cal.Rptr. 821].)

---

[10] Code of Civil Procedure section 568, unofficially entitled "Powers of Receivers," provides: "The receiver has, under the control of the Court, power to bring and defend actions in his own name, as receiver; to take and keep possession of the property, to receive rents, collect debts, to compound for and compromise the same, to make transfers, and generally to do such acts respecting the property as the Court may authorize."

[11] Code of Civil Procedure section 568.5 provides: "A receiver may, pursuant to an order of the court, sell real or personal property in the receiver's possession upon the notice and in the manner prescribed by Article 6 (commencing with Section 701.510) of Chapter 3 of Division 2 of Title 9. The sale is not final until confirmed by the court."

Additionally, the trial court appointing the receiver has broad power to prescribe and, as necessary, change the manner in which property is to be sold. (*Lesser & Son, supra,* 35 Cal.2d at p. 499.) The court in *Lesser & Son* explained: "We are satisfied that a court in an equity proceeding has the power to change the manner of sale of property in its custody by a receiver appointed by it from that previously prescribed by it in the order directing the sale, and in that connection may make the sale itself although the prior order called for it to be made by the receiver. In effect, the directions in the order of sale with regard to the manner in which it should be made, are merely instructions to the receiver—his procedural directions. They do not go to the substantive rights of the parties." (*Ibid.*)

The court in *Lesser & Son* further explained the reason underlying the trial court's broad authority concerning a receiver's sale: The "main function" of the court is to manage or dispose of the property "in the best manner possible and for the best interest of the parties concerned. To effectually perform that duty necessarily requires some flexibility and continuity of jurisdiction in giving instructions to the receiver as to the manner in which the property should be sold to meet exigencies as they may arise." (*Lesser & Son, supra,* 35 Cal.2d at p. 499; accord, *Steinberg v. Goldstein* (1954) 129 Cal.App.2d 682, 685–686 [278 P.2d 22].)

A trial court's broad authority to approve a receiver's sale and to direct the manner in which the sale is to be conducted is reflected in more recent appellate court decisions: " 'The matter of confirmation rests upon the sound discretion of the appointing court to be judicially exercised in view of all the surrounding facts and circumstances and in the interest of fairness, justice and rights of the respective parties.' " (*People v. Riverside University* (1973) 35 Cal.App.3d 572, 582 [111 Cal.Rptr. 68].) "The proper exercise of discretion requires the court to consider all material facts and evidence and to apply legal principles essential to an informed, intelligent, and just decision. [Citation.]" (*Cal-American Income Property Fund VII v. Brown Development Corp.* (1982) 138 Cal.App.3d 268, 274 [187 Cal.Rptr. 703].)

In reviewing a trial court's orders confirming or denying a receiver's sale, an appellate court's "view of the facts must be in the light most favorable to the order . . . . Reversal is warranted only after concluding the trial court abused its discretion by confirming a fraudulent, unfair, or oppressive sale." (*Cal-American Income Property Fund VII v. Brown Development Corp., supra,* 138 Cal.App.3d at p. 274.) " 'Generally speaking if no good reason appears for refusing to confirm a receiver's sale, such as chilling of bids or

other misconduct or gross inadequacy of price, the sale should be confirmed. . . .' " (*People v. Riverside University, supra,* 35 Cal.App.3d at p. 582.)

### 3. *Kane's Contentions*

Kane argues that federal bankruptcy court cases have recognized the expectant rights of and value provided by stalking horse bidders. Indeed, federal circuit courts have held that bankruptcy courts have wide discretion in structuring sales of estate assets. (*In re Food Barn Stores, Inc.* (8th Cir. 1997) 107 F.3d 558, 565 (*Food Barn Stores*).) Bankruptcy courts have "ample latitude to strike a satisfactory balance between the relevant factors of fairness, finality, integrity, and maximization of assets. '[The courts] must be accorded sufficient discretion to decide the truly close cases as best [they] can in view of these competing considerations.' " (*Id.* at p. 566; accord, *In re Wintz Companies* (8th Cir. 2000) 219 F.3d 807, 812.)

As Kane argues, bankruptcy courts must balance the reasonable expectations of bidders and others against the need to maximize value to the estate. (*Food Barn Stores, supra,* 107 F.3d at pp. 564–566.) Generally, " 'it is an abuse of discretion for a bankruptcy court to refuse to confirm an adequate bid received in a properly and fairly conducted sale merely because a slightly higher offer has been received after the bidding is closed.' [Citation.]" (*Id.* at p. 564.) Nevertheless, "[t]he policy favoring confirmation of a bankruptcy sale to the highest bidder at a fairly conducted public auction gives way to the goal of benefitting the bankrupt estate and its creditors when the sale price would be 'grossly inadequate.' " (*In re Muscongus Bay Co.* (1st Cir. 1979) 597 F.2d 11, 12.) "*In other situations,* where the sale had not progressed to a comparable plateau [where the sales price would not be 'grossly inadequate'], *a reviewing court should evaluate the bankruptcy judge's decisions on a case by case basis, with due regard both for the parties' expectations and the judge's broad discretion to weigh the multifarious interests involved.*" (*Food Barn Stores, supra,* at p. 565, italics added.)

█ A bankruptcy court's broad discretion to balance competing considerations in determining whether to confirm a bankruptcy sale mirrors a state court's broad discretion to confirm or deny a receiver's sale " 'in view of all the surrounding facts and circumstances and in the interest of fairness, justice and rights of the respective parties.' " (*People v. Riverside University, supra,* 35 Cal.App.3d at p. 582.) Maximizing the sales price to the receivership is not the only factor that the trial court must consider, particularly when an

adequate sales price is available following a duly noticed and properly conducted public auction. In an appropriate case, other considerations may outweigh the need to maximize the sales price to the receivership.

We agree that Kane's initial bid provided value to the receivership. It set a minimum price for the Kia dealership franchise and other assets at the first auction, and a minimum type and amount of other Kia dealership assets that were offered for sale. It also assisted Moldo in opposing and effectively delaying KMA's motion to terminate the Kia dealership franchise, pending a sale of the Kia dealership assets.[12] For these reasons, Kane's initial offer and concomitant bid matching right, which Kane negotiated in consideration for its initial bid, were entitled to some weight when the trial court determined whether to confirm the sale to Kane.

Nevertheless, we disagree that Kane's interest in its initial offer and bid matching right outweighed the competing interest of the receivership in maximizing the sales price for the Kia dealership assets. Kane knew that its purchase contract or bid matching right was subject to court approval, and that the court had not approved it in advance of the January 16 auction. Thus, Kane had "some fledgling expectation" that its bid matching right would be given some weight, but its expectation was "not nearly mature enough" to render the trial court's disapproval of the sale to Kane an abuse of discretion. (*Food Barn Stores, supra,* 107 F.3d at p. 566.)

Moreover, Kane's bid matching right substantially suppressed the bidding at the first auction. It allowed Kane to refrain from bidding and watch while the other bidders bid against each other. It gave Kane a trump card, which it used to match O'Brien's highest bid of $490,000 after the bidding had closed. Based on O'Brien's immediate, postauction bid of $550,000 and Shaver's postauction conditional bid of $590,000, the receivership stood to realize a much higher sales price for the Kia dealership assets at a second auction.

█ Accordingly, the trial court did not abuse its discretion in refusing to approve the sale to Kane, voiding Kane's bid matching right, ordering a second auction, and subsequently approving the sale to Shaver. Kane's bid matching right was simply too expensive in relation to the value to the receivership of Kane's initial bid. Shaver's highest bid at the second auction

---

[12] It is doubtful, however, that Kane's initial bid was solely responsible for the other bidders' interest in the Kia dealership assets. There were six qualified bidders at the initial auction, including Kane. It is also doubtful that Kane's initial bid was solely responsible for the trial court denying KMA's motion to terminate the Kia dealership, pending a sale of the assets.

resulted in over $1 million more to the receivership estate than the highest prices offered at the initial auction and the highest prices offered at the second auction when the Kia dealership assets and real estate were offered separately. Finally, all the qualified bidders had a reasonable expectation that the bidding would be conducted fairly, with all bidders bidding against each other.

In discussing a right of first refusal or bid matching right similar to Kane's, the court in *Food Barn Stores* observed: "Some amount of bid protection is, of course, permissible under the [United States] Code, and the trustee is not normally required to seek court approval before in good faith entering into an agreement which includes a right of first refusal. [Citation.] 'A contrary position might discourage potential buyers from negotiating with trustees, thereby forcing down the market value of the bankruptcy estate['s] property in general.' [Citation.] Still, it would be unwise to allow the parties to hamstring the court's discretion to implement bidding procedures it deems to be fit under the circumstances. The bankruptcy judge must retain the capability to conduct sales in a manner that most benefits the bankruptcy estate, and we would be loath to accept any contractual provisions that purport to limit this authority." (*Food Barn Stores, supra,* 107 F.3d at pp. 567–568.) Here, too, enforcing Kane's bid matching right or right of first refusal would have been unfair to the receivership and to the other interested parties under the circumstances of this case.

■ We reject Kane's further contention that there was no evidence to support the trial court's order allowing the second auction to be held *immediately* following the February 6 hearing. (*Cal-American Income Property Fund VII v. Brown Development Corp., supra,* 138 Cal.App.3d at p. 275 [receiver must show necessity for immediate sale].) KMA's counsel was present at the February 6 hearing, and advised the trial court that the Kia dealership's customers were having to travel approximately 60 miles to have their cars serviced. KMA had also been advocating its right to terminate the Kia dealership franchise since November 20, 2003, following the franchise's closure on November 6, 2003. The trial court thus had ample reason to order an immediate second auction.

Additionally, O'Brien, Shaver, and the other qualified bidders were present at the February 6 hearing. They were ready and willing to participate, and did participate, in the second auction. Kane also participated in the second auction, offering $650,000 for the Kia dealership franchise alone. Kane

conceded at the hearing that it would not be bidding for the real estate. Thus, we reject Kane's suggestion that it would have outbid Shaver for the Kia dealership assets and real estate, had the second auction been held on a later date.

D. *The Trial Court's Order Allowing the Immediate Second Auction Did Not Violate Kane's Procedural Due Process Rights*

Kane further argues that the trial court's order allowing the second auction to be held immediately after the February 6 hearing violated its procedural due process right "to adequate notice of the voiding of the [o]riginal [a]uction." We disagree.

As Kane argues, " '[t]he primary purpose of procedural due process is to provide affected parties with the right to be heard at a meaningful time and in a meaningful manner. Consequently, due process is a flexible concept, as the characteristic of elasticity is required in order to tailor the process to the particular need.' " (*Edward W. v. Lamkins* (2002) 99 Cal.App.4th 516, 532 [122 Cal.Rptr.2d 1].)

Here, Kane was not deprived of an opportunity to be heard concerning the timing of the second auction. The original auction was not "voided" at the February 6 hearing. Instead, Moldo's motion to approve the sale to Kane was denied. At the February 6 hearing, Kane had every reason to expect that a second auction would be immediately held in the event the sale to Kane was not confirmed. Moreover, Kane did not ask the trial court to delay the second auction at the February 6 hearing. Instead, Kane participated in the second auction, apparently to the same extent it would have participated regardless of when the second auction was held.

Lastly, we reject Kane's argument that "the receiver hid the correct legal standard from the trial court and deprived Kane of the opportunity to present the correct standard." (Capitalization and emphasis omitted.) At the February 6 hearing, Kane's counsel ably argued to the trial court that its initial bid provided value to the receivership, and that the sales price to the receivership was not the only factor the trial court had to consider. And before the February 6 hearing, Kane filed responses to the objections of O'Brien, Shaver, and other objectors, stating its position.

## DISPOSITION

The court's February 6, 2004, orders disapproving the sale of the Kia dealership assets to Kane, voiding Kane's bid matching right, ordering a second auction, and approving the sale of the Kia dealership assets to Shaver, are affirmed. Moldo shall recover its costs on this appeal.

McKinster, Acting P. J., and Richli, J., concurred.

Appellant's petition for review by the Supreme Court was denied October 19, 2005. Kennard, J., did not participate therein.