[No. B226170. Second Dist., Div. Seven. Feb. 14, 2011.]

MICHAEL BABALOLA, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

## COUNSEL

Ronald L. Brown and Michael P. Judge, Public Defenders, Albert J. Menaster, Marya Shahriary and Karen Nash, Deputy Public Defenders, for Petitioner.

No appearance for Respondent.

Steve Cooley, District Attorney, Brentford Ferreira and Patrick D. Moran, Deputy District Attorneys, for Real Party in Interest.

## OPINION

**PERLUSS, P. J.**—Penal Code section 136.2, subdivision (a),[1] authorizes the trial court in a criminal case, "upon a good cause belief that harm to, or intimidation or dissuasion of, a victim or witness has occurred or is reasonably likely to occur," to issue orders (generally referred to as "criminal protective orders") including an ex parte no-contact or stay-away order pursuant to Family Code section 6320;[2] an order that the defendant or any other person before the court not violate any provision of section 136.1, which prohibits intimidation of victims or witnesses; an order that the defendant have no communication with the victim or a specified witness except through an attorney; and an order protecting the victim of a violent crime from all contact by the defendant.

---

[1] Statutory references are to the Penal Code unless otherwise indicated.

[2] Family Code section 6320, subdivision (a), provides, "[t]he court may issue an ex parte order enjoining a party from molesting, attacking, striking, stalking, threatening, sexually assaulting, battering, harassing, telephoning . . . , destroying personal property, contacting, either directly or indirectly, by mail or otherwise, coming within a specified distance of, or disturbing the peace of the other party . . . ."

In *People v. Stone* (2004) 123 Cal.App.4th 153 [19 Cal.Rptr.3d 771] (*Stone*) Division Two of this court construed section 136.2 narrowly, holding restraining orders authorized by this provision "are those aimed at preserving the integrity of the administration of criminal court proceedings and protecting those involved in them. It therefore follows that the required good cause must show a threat, or likely threat to criminal proceedings or participation in them." (*Stone*, at p. 160.) In an express response to *Stone*, in 2008 the Legislature added subdivision (h) to section 136.2, which provides, in a case in which a crime of domestic violence is charged, the court may consider, in determining whether good cause exists to issue an ex parte order pursuant to Family Code section 6320, "the underlying nature of the offense charged" and the defendant's history of domestic violence, prior restraining orders and other forms of violence or weapons offenses.

In an aggravated assault case not involving domestic violence may the court issue a criminal protective order, barring any contact between the defendant and the victim and witnesses and directing the defendant to sell or surrender any firearms he or she may possess, solely on information concerning the underlying nature of the charged offense and without any evidence that intimidation or dissuasion of the victim or witnesses has occurred or is reasonably likely to occur? Based on the language of section 136.2 itself and the evolution of that statute during the past 30 years in connection with the Legislature's efforts to strengthen the protection afforded victims of domestic violence, we conclude that, while past harm alone is sufficient for issuance of a criminal protective order in domestic violence cases, when there is no charge of domestic violence, more is required.

Petitioner Michael Babalola was not charged with crimes involving domestic violence; and there was no basis for a good cause belief he had attempted either during or after the commission of the alleged aggravated assaults to intimidate or dissuade his victims, Donald Jones and Catrina Godfrey, from reporting the crimes or testifying against him and no evidence of any likelihood of future intimidation or harm to the victims. Accordingly, respondent superior court erred in issuing a protective order pursuant to section 136.2 in the underlying criminal proceeding. Nonetheless, because the court vacated that criminal protective order in response to our order and alternative writ of mandate, we dismiss Babalola's petition for writ of mandate as moot.[3]

---

[3] Although the superior court vacated the order challenged by Babalola's petition immediately after the issuance of the alternative writ, because the petition raises issues of public importance in the context of temporary pretrial orders that may evade review, by order dated September 9, 2010 we stated our intention to exercise our inherent discretion to resolve the issues presented.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *Summary of the Evidence Presented at the Preliminary Hearing*

    a.  *The People's evidence*

On February 25, 2010 a felony complaint was filed against Michael Babalola charging him with two counts of assault with a semiautomatic firearm against Catrina Godfrey and her boyfriend, Donald Jones. (§ 245, subd. (b).) At the preliminary hearing Godfrey testified she and Jones were walking home from a bar during the early morning hours on November 1, 2009 when she began to feel ill. To steady herself, Godfrey put her hand against the window of a building on Foothill Boulevard that housed Babalola's business; Jones and Godfrey's apartment overlooked the back door of the business. According to Godfrey, Babalola came rushing outside, loudly asking her why she was banging on his window. When Godfrey tried to leave, Babalola pushed her against the window and repeatedly hit her with his fist and a handgun.

In his questioning of Godfrey, Babalola's counsel began to develop the defense theme that Godfrey and Jones had been the aggressors in the incident, motivated by racial animus: Babalola is an African-American; his girlfriend and business partner, Julie Brooks, is White; Godfrey and Jones are both White. On cross-examination Godfrey admitted she is standing in front of a Confederate flag in a picture posted on her social networking site profile. She explained, however, the photograph was not intended to express any racial hatred. Rather, she had lived in Alabama for several years, and the flag was given to her by her best friend's grandmother, who had passed away. Godfrey also denied using racial slurs, explaining the words "Fuck Nigger" appeared on her profile after her account was "hacked."

Jones's account of the incident was mostly consistent with Godfrey's. Jones additionally testified he swung at Babalola in an attempt to rescue Godfrey, but Babalola hit him in the head with his gun and knocked him down. When Jones got up, Babalola pointed the gun in his face and told him he was "going to die tonight." Babalola then retreated into his business and locked the door.

Jones testified he had seen Babalola in the alley behind the business approximately 15 times, but neither he nor Godfrey had had any problems with Babalola or Brooks. During cross-examination Jones insisted there was nothing about Babalola or his cross-racial relationship with Brooks that

bothered him. Jones denied there was a picture of him on Godfrey's social networking site standing near a burning wood cross, explaining the burning boards were in the shape of an anarchy symbol, not a cross. Jones also claimed the gesture he was making with his fingers in the picture had no meaning.

### b. *The defense's evidence*

Brooks testified she and Babalola live in adjoining units behind two retail business stores they jointly operate. On October 31, 2009, the day of the incident, she had discovered the security cameras and solar panel used for lighting were missing from the building in which the businesses and residences are located. The police officer who investigated told Brooks the theft or disabling of security and lighting equipment is often a precursor to a burglary and suggested she be on alert that evening.

Just after midnight on November 1, 2009 Brooks and Babalola were working when they heard a loud bang and rattle at one of the doors. Babalola went outside and told Godfrey and Jones to leave. Brooks, who had subsequently gone to the door, saw Godfrey suddenly hit Babalola in the head. When Babalola tried to defend himself, both Jones and Godfrey began hitting him. After they cornered Babalola in the entranceway, Babalola pulled a gun out of his pocket. When Jones began to reach under his shirt, Babalola struck him with the gun. Brooks ran inside the store to get her phone while the three others continued to fight. After she found her phone and returned to the entrance, Babalola had already retreated into the store and was talking to the police on his phone. Brooks could hear Godfrey and Jones outside yelling profanity and racial slurs. Brooks also testified she had previously obtained a temporary restraining order after being harassed by Godfrey and Jones.

### 2. *The Protective Order*

Babalola appeared at pretrial hearings on March 18, 2010, April 28, 2010 and May 24, 2010. No request for a criminal protective order was made during any of those proceedings. On June 24, 2010, however, at a further pretrial hearing, the court advised Babalola the prosecutor had submitted a proposed protective order for it to consider. The deputy district attorney, who had not participated in the preliminary hearing, explained he was seeking a protective order to prevent any contact between Babalola and the victims given how close they lived to each other and the possibility of "bad blood"

between them: "Your Honor, it's my understanding from the facts of this case that the defendant and the victims reside within feet away from each other. I simply want to prevent any contact between them in the form of inappropriate conduct or trying to dissuade people or talking to them or anything negative. I understand that, based on the facts of this case and other facts that were flushed out at preliminary hearing, that there might be some bad blood between [them]."

Babalola's counsel objected, asking that the court set the matter for a future hearing and then, when the court denied that request,[4] contending that *Stone, supra*, 123 Cal.App.4th 153, "clearly holds that no protective order shall issue unless there is some evidence of situations, incidents, attempted contact or contact after the alleged incident and filing of charges." Noting the transcript of the preliminary hearing had not been provided to the court (the judge at this hearing had not presided at the preliminary hearing) and the prosecutor had apparently read to the court from summary notes, defense counsel argued no evidence had been presented that Babalola had threatened or engaged in any other improper contact with Godfrey and Jones after the November 1, 2009 incident. Counsel also asserted Godfrey and Jones were not credible, having been impeached "in multiple ways," and argued they may have engaged in activities demonstrating racial animus.

The court overruled Babalola's objection, finding good cause to issue the protective order "based upon the evidence produced at [the preliminary] hearing that there is a reasonable likelihood of danger to the victim in this case based upon the nature of the charge and the information provided." As issued, the protective order provided, in part, that Babalola "must not harass, strike, threaten, assault (sexually or otherwise), follow, stalk, molest, destroy or damage the personal property or real property or disturb the peace, keep under surveillance, or block movements of the protected persons named" in the order, Jones and Godfrey, and that he "must have no personal, electronic, telephonic, or written contact" with them and "no contact with [Jones and Godfrey] through any third party, except an attorney of record." The order further provided that Babalola "must not attempt to or actually prevent or dissuade any victim or witness from attending a hearing or testifying or making a report to any law enforcement agency or person" and directed him to surrender to local law enforcement or sell to a licensed gun dealer any firearm owned by him or subject to his possession or control.

### 3. *The Petition for Writ of Mandate*

On July 29, 2010 Babalola petitioned this court for a writ of mandate contending, as he had in the superior court, issuance of a protective order

---

[4] The court responded to defense counsel's request, "This would be the hearing."

pursuant to section 136.2 was improper because there was no evidence he had harmed, intimidated or dissuaded any victims or witnesses after the criminal proceedings had commenced with the intent to interfere with the proceedings. (See *Stone, supra*, 123 Cal.App.4th at pp. 160–161; *People v. Ponce* (2009) 173 Cal.App.4th 378, 384 [92 Cal.Rptr.3d 667] ["there was no evidence that after being charged [the defendant] had threatened, or had tried to dissuade, any witness, or had tried to unlawfully interfere with the criminal proceedings"].)

■ On August 26, 2010, after receiving an informal response from the People, we issued an alternative writ of mandate directing the superior court either to vacate the protective order or to show cause why a peremptory writ of mandate requiring it to do so should not issue. In response, on August 27, 2010 the superior court vacated the criminal protective order it had issued against Babalola on June 24, 2010. On September 7, 2010 Babalola's counsel acknowledged in a letter to this court that the petition for writ of mandate was now moot, but requested we resolve the issues presented because "[p]rotective orders like the one in this case are issued routinely . . . without good cause or due process of law, and often become moot before the issues may be decided." On September 9, 2010 we directed the People to file a written return to the petition, explaining, "[b]ecause the petition presents issues of public importance in the context of orders that elude review, this court will exercise its inherent discretion to resolve the issues." (See *Edelstein v. City and County of San Francisco* (2002) 29 Cal.4th 164, 172 [126 Cal.Rptr.2d 727, 56 P.3d 1029] [" ' "[i]f a pending case poses an issue of broad public interest that is likely to recur, the court may exercise an inherent discretion to resolve that issue even though an event occurring during its pendency would normally render the matter moot" ' "]; *Conservatorship of Wendland* (2001) 26 Cal.4th 519, 524, fn. 1 [110 Cal.Rptr.2d 412, 28 P.3d 151] [appellate courts have the "discretion to decide otherwise moot cases presenting important issues that are capable of repetition yet tend to evade review"]; *Ramos v. Superior Court* (2007) 146 Cal.App.4th 719, 723, fn. 2 [53 Cal.Rptr.3d 189].)

## CONTENTIONS

Babalola contends section 136.2 authorizes a criminal protective order only if the defendant attempted to intimidate a witness or victim or there is a reasonable likelihood that such an attempt to intimidate a witness or victim will occur and no evidence of any such threat was presented in the underlying proceeding. He also contends he was not afforded proper notice of the hearing at which the protective order was issued or an adequate opportunity to present evidence in opposition to the issuance of the order.

## DISCUSSION

### 1. Standard of Review

Issues of statutory interpretation are questions of law subject to our independent or de novo review. (*In re Tobacco II Cases* (2009) 46 Cal.4th 298, 311 [93 Cal.Rptr.3d 559, 207 P.3d 20]; *People ex rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 432 [101 Cal.Rptr.2d 200, 11 P.3d 956]; see *California Veterinary Medical Assn. v. City of West Hollywood* (2007) 152 Cal.App.4th 536, 546 [61 Cal.Rptr.3d 318].) "The fundamental purpose of statutory construction is to ascertain the intent of the lawmakers so as to effectuate the purpose of the law. [Citations.] In order to determine this intent, we begin by examining the language of the statute. [Citations.] But '[i]t is a settled principle of statutory interpretation that language of a statute should not be given a literal meaning if doing so would result in absurd consequences which the Legislature did not intend.' [Citations.] Thus, '[t]he intent prevails over the letter, and the letter will, if possible, be so read as to conform to the spirit of the act.' [Citation.] Finally, we do not construe statutes in isolation, but rather read every statute 'with reference to the entire scheme of law of which it is part so that the whole may be harmonized and retain effectiveness.' " (*People v. Pieters* (1991) 52 Cal.3d 894, 898–899 [276 Cal.Rptr. 918, 802 P.2d 420].)

### 2. The Evolution of Section 136.2's Authorization for Criminal Protective Orders

#### a. Adoption of the statute

The American Bar Association's Section of Criminal Justice, Committee on Victims, in 1979 issued a report and recommendations, including a proposed model statute, for reducing victim and witness intimidation in criminal proceedings.[5] In large part in response to that report the California Legislature repealed former section 136,[6] and replaced it with sections 136, 136.1 and 136.2: Section 136, which remains unchanged today, defines "malice," "witness" and "victim"; former section 136.1 defined misdemeanor and felony offenses of preventing or dissuading, or attempting to prevent or dissuade, a witness or victim; and former section 136.2 provided for the

---

[5] The American Bar Association House of Delegates approved the recommendations in the report in August 1980.

[6] Former section 136, subdivision (a), made it a misdemeanor to "willfully and unlawfully prevent[] or dissuade[] any person who is or may become a witness, from attending upon any trial, proceeding or inquiry, authorized by law." (Stats. 1979, ch. 944, § 1, p. 3252.) Former section 136, subdivision (b), made it a felony to prevent or dissuade a witness by means of force or threats of unlawful injury or damage to property. (Stats. 1979, ch. 944, § 1, p. 3252.)

issuance of criminal protective orders "[u]pon a good cause belief that intimidation or dissuasion of a victim or witness has occurred or is reasonably likely to occur." (Stats. 1980, ch. 686, § 2.2, p. 2077.)[7]

### b. *Expansion of section 136.2 to provide greater protection to the victims of domestic violence*

In 1988, dissatisfied with the refusal of some courts to issue protective orders under section 136.2 in cases involving victims of domestic violence, the Legislature added then subdivision (f) (now renumbered as subd. (a)(7)(A)) to section 136.2, expressly authorizing the issuance of orders "protecting victims of violent crime from contact, with the intent to annoy, harass, threaten, or commit acts of violence, by the defendant." (Stats. 1988, ch. 183, § 1, p. 777.) Although written broadly to include victims of all violent crime, not just domestic violence, the legislative history plainly demonstrates the Legislature's concern to protect victims of domestic violence: "According to the bill's sponsor, the Los Angeles City Attorney's Office, pretrial restraining orders are essential in crimes involving domestic violence. Current law authorizing judges to issue restraining orders in criminal cases does not specifically authorize orders which protect victims of violent crime from further harassment, threats, or acts of violence by the defendant. In some cases, the lack of specificity in the current law has caused courts to refuse to issue appropriate protective orders. This bill is needed to provide legislative guidance for the courts on this issue." (3d reading analysis of Assem. Bill No. 3709 (1987–1988 Reg. Sess.) as amended Apr. 7, 1988.)

Section 136.2 was amended again in 1990 as part of legislation revising portions of the Domestic Violence Prevention Act (Code Civ. Proc., former § 540 et seq.; now Fam. Code, § 6200 et seq.; see Stats. 1993, ch. 219, § 154, p. 1654). Then designated section 136.2, subdivision (g) (now renumbered as subd. (e)(1)) was added providing, "In all cases where the defendant is

---

[7] As initially enacted, former section 136.2 provided, "Upon a good cause belief that intimidation or dissuasion of a victim or witness has occurred or is reasonably likely to occur, any court with jurisdiction over a criminal matter may issue orders including, but not limited to, the following: [¶] (a) An order that a defendant shall not violate any provision of Section 136.1. [¶] (b) An order that a person before the court other than a defendant, including, but not limited to, a subpoenaed witness or other person entering the courtroom of the court, shall not violate any provisions of Section 136.1 [¶] (c) An order that any person described in this section shall have no communication whatsoever with any specified witness or any victim, except through an attorney under such reasonable restrictions as the court may impose. [¶] (d) An order calling for a hearing to determine if an order as described in subdivisions (a) to (c), inclusive, should be issued. [¶] (e) An order that a particular law enforcement agency within the jurisdiction of the court provide protection for a victim or a witness or both. . . . [¶] Any person violating any order made pursuant to subdivisions (a) to (e), inclusive, may be punished for any substantive offense described in Section 136.1, or for a contempt of the court making the order. . . ." (Stats. 1980, ch. 686, § 2.2, pp. 2077–2078.)

charged with a crime of domestic violence, as defined in Section 13700, the court shall consider issuing the above-described orders on its own motion. In order to facilitate this, the court's records of all criminal cases involving domestic violence shall be marked to clearly alert the court to this issue." (Stats. 1990, ch. 935, § 6, p. 4001.) A provision was also added requiring the Judicial Council to adopt forms for orders under section 136.2. (Stats. 1990, ch. 935, § 6, p. 4001.)

    c.   *The addition of "harm" as a basis for issuing a protective order under section 136.2*

In 1996 Assembly Bill No. 2224 (1995–1996 Reg. Sess.) was passed to broaden the court's authority to issue ex parte no-contact and stay-away orders under the Domestic Violence Prevention Act. (Stats. 1996, ch. 904, § 1, p. 4989.) The same legislation also amended section 136.2, authorizing the trial court in a criminal proceeding to issue "[a]ny order issued pursuant to Section 6320 of the Family Code." (Stats. 1996, ch. 904, § 2, p. 4989 [now subd. (a)(1)].) In addition, the phrase "harm to, or" was inserted in the opening paragraph of section 136.2, expanding the grounds for issuance of a criminal protective order to more than past, or the reasonable likelihood of future, intimidation or dissuasion: "Upon a good cause belief that harm to, or intimidation or dissuasion of, a victim or witness has occurred or is reasonably likely to occur, any court with jurisdiction over a criminal matter may issue" orders including those enumerated in the statute. (Stats. 1996, ch. 904, § 2, p. 4989.)

Nothing in the legislative history directly addresses the addition of the term "harm" to section 136.2. Yet it can be reasonably deduced from the more general discussion concerning the purpose of Assembly Bill No. 2224 (1995–1996 Reg. Sess.) that the Legislature believed its inclusion as a ground for issuance of a criminal protective order was necessary to give effect to the criminal court's new authority to issue ex parte orders pursuant to Family Code section 6320. Otherwise, there was a likelihood some courts, which had in the past been resistant to issuing domestic violence protective orders in criminal proceedings, would continue to require evidence of intimidation or dissuasion, a standard far narrower than sufficient to protect victims of domestic violence. (See Assem. 3d reading of Assem. Bill No. 2224 (1995–1996 Reg. Sess.) as amended Apr. 22, 1996, pp. 2–3 [one purpose of the legislation is to "expand[] the scope of restraining order prohibitions, thus allowing for more equitable and successful prosecution of domestic violence cases"].)

d. *The* Stone *court's narrow interpretation of section 136.2 and the Legislature's amendment of the statute in response*

In *Stone, supra*, 123 Cal.App.4th at page 156 our colleagues in Division Two considered the validity of a criminal protective order entered against Monti Kirk Stone, who had attacked his roommate, Theodore Walton, and threatened to kill him. Stone was charged with assault and making a criminal threat. At trial Michele Magnosa testified Stone had attacked her several years earlier when they were roommates and also threatened to kill her and her children if she called the police. (*Id.* at p. 157.)[8] Magnosa testified she was still afraid of Stone. (*Ibid.*) After the jury was instructed but before it returned with a verdict, the trial court issued protective orders pursuant to section 136.2 restricting Stone's contact with both Walton and Magnosa for three years; the court checked the box on the Judicial Council form for protective orders in criminal proceedings designating the orders as " 'Order Post-trial Probation Condition.' " (*Stone*, at p. 158.) Stone was found guilty of both charges and sentenced to an aggregate state prison term of four years. (*Id.* at pp. 155–156.)

The *Stone* court reversed the protective orders on two independent grounds: First, orders issued pursuant to section 136.2 are intended to protect victims and witnesses during the pendency of a criminal proceeding and may not extend beyond that period. (*Stone, supra*, 123 Cal.App.4th at p. 159.) The orders being reversed, however, were not limited to the pendency of the criminal proceedings; nor could they properly be considered probation conditions because Stone was not given probation. Accordingly, they "transcended the authorization of section 136.2." (*Id.* at p. 160; see also *People v. Ponce, supra*, 173 Cal.App.4th at pp. 381–383 [protective order issued pursuant to § 136.2 was not authorized where the duration of the order extended beyond the pendency of criminal proceedings].)

Second, the *Stone* court held there was no evidence supporting the trial court's finding of good cause for issuance of the protective orders. The court explained, "[I]t is only wrongdoing aimed at a victim or witness that justifies the restraining order. . . . [A]s we previously stated, . . . the restraining orders authorized by section 136.2 are those aimed at preserving the integrity of the administration of criminal court proceedings and protecting those involved in them. It therefore follows that the required good cause must show a threat, or likely threat to criminal proceedings or participation in them. [¶] At the time of [Stone's] attacks on Walton and Magnosa, neither was a witness nor a victim with regard to any ongoing criminal prosecution and therefore those

---

[8] A close reading of the published portion of the opinion indicates Magnosa was testifying as a witness to instances of uncharged misconduct, not as a victim of the crimes for which Stone was on trial. Magnosa's status is confirmed in the unpublished portion of the opinion.

attacks presented no direct threat to the administration of any criminal proceedings or to their participation in them. There was no additional evidence here that either Walton or Magnosa were ever harmed, intimidated or dissuaded, or that there was a likelihood that that would occur, after they became victims or witnesses in an ongoing criminal proceeding. There was no evidence, for example, that after being charged in this matter, [Stone], or anyone on his behalf and at his behest, made any efforts by threat or force to dissuade either Walton or Magnosa from testifying against him or proceeding with the prosecution. The fact that he had assaulted both of them before there were any criminal proceedings, and without any intent to interfere with such proceedings, is insufficient to justify the restraining orders." (*Stone, supra,* 123 Cal.App.4th at pp. 160–161; see also *People v. Ponce, supra,* 173 Cal.App.4th at p. 384 [quoting *Stone*].)

The Legislature amended section 136.2 in response to *Stone* (Assem. Bill No. 1771 (2007–2008 Reg. Sess.) as amended Apr. 29, 2008), adding subdivision (h): "In any case in which a complaint, information, or indictment charging a crime of domestic violence, as defined in Section 13700, has been filed, the court may consider, in determining whether good cause exists to issue an order under paragraph (1) of subdivision (a) [(that is, a Fam. Code, § 6320 order)], the underlying nature of the offense charged . . . ." According to the author of Assembly Bill No. 1771, " 'People v. Stone's interpretation of Penal Code 136.2 is too narrow and does not provide the criminal court with sufficient authority to protect victims of domestic violence. [¶] 'Prior to People v. Stone, most criminal courts did not interpret PC 136.2 in this narrow way. Many courts continue to read PC 136.2 to authorize them to protect victims of domestic violence whenever they find good cause to believe that the victim is in danger of future harm based on the facts underlying the charged offense. AB 1771, as amended, simply codifies this practice. [¶] 'AB 1771 would clarify Penal Code 136.2 by providing that the underlying nature of the offense charged can be a sufficient basis for determining whether good cause exists to issue a criminal protective order.' " (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 1771 (2007–2008 Reg. Sess.) as amended Apr. 29, 2008, pp. 3–4.)

3.  *Section 136.2 Criminal Protective Orders May Be Properly Issued Based on the Underlying Charges in Domestic Violence Cases and Cases Involving Witness and Victim Intimidation*

a.  *Victim and witness intimidation*

The 1979 ABA report and recommendations described the "two unique aspects" of the crime of victim and witness intimidation: "It is the one crime in which only unsuccessful attempts are ever reported or discovered. It is also

a crime which inherently thwarts the process of criminal justice itself." (ABA Section of Crim. Justice, Com. on Victims, Reducing Victim/Witness Intimidation: A Package, p. 1.) The adoption of sections 136.1 and 136.2 in 1980, encouraged by the ABA recommendations, was intended in part to protect victims and witnesses so they would report crimes. This purpose is evident in section 136, subdivision (3)'s definition of "victim," as "any natural person with respect to whom there is reason to believe that any crime as defined under the laws of this state or any other state or of the United States *is being* or has been perpetrated or attempted to be perpetrated" (italics added)[9] and section 136.1, subdivision (b)(1)'s criminalization of any attempt to prevent or dissuade a victim of a crime from reporting that crime to the police. A "victim" for purposes of section 136.2, therefore, exists from the time the crime is committed; and intimidation or an attempt to dissuade a victim from reporting the crime or testifying at trial—the basis for issuance of a criminal protective order—can occur before criminal charges are filed (although the order itself cannot be made until charges are filed and the criminal court has jurisdiction in the matter). Accordingly, the underlying charges themselves and evidence of the circumstances surrounding their commission may be sufficient for issuance of a criminal protective order if they establish intimidation or dissuasion of a victim occurred or was attempted.

■ Contrary to the argument advanced by Babalola in the superior court and his petition for a writ of mandate,[10] the court in *Stone, supra*, 123 Cal.App.4th 153, did not hold that only conduct occurring after criminal charges have been filed may be considered in determining whether good cause exists for issuance of a criminal protective order under section 136.2. Rather, emphasizing that such orders are "aimed at preserving the integrity of the administration of criminal court proceedings and protecting those involved in them" (*Stone*, at p. 160), the court concluded evidence of an assault "before there were any criminal proceedings, and *without any intent to interfere with such proceedings*, is insufficient" to justify a criminal protective order (*id.* at p. 161, italics added). Plainly, evidence of an assault coupled with an intent to dissuade the victim or a witness from reporting the crime would interfere with the criminal justice system and would be sufficient to

---

[9] Section 136, subdivision (2)'s definition of "witness" includes any natural person "having knowledge of the existence or nonexistence of facts relating to any crime." Like the definition of "victim," nothing in that statutory definition requires the filing of criminal charges or the pendency of criminal proceedings before the protections of sections 136.1 and 136.2 are available to a "witness."

[10] Babalola abandoned this contention in his reply to the People's return. The People had argued *Stone* and *People v. Ponce, supra*, 173 Cal.App.4th at page 384, are wrong to the extent they require after-charged conduct for issuance of a criminal protective order under section 136.2.

warrant issuance of a criminal protective order. Any other interpretation of the statutory scheme would be utterly inconsistent with its express wording and its very purpose.

### b. *Domestic violence*

Read literally and in isolation, section 136.2's disjunctive construction would permit the issuance of a restraining order in the event any harm to a victim or witness has occurred or is reasonably likely to occur. (See *Melamed v. City of Long Beach* (1993) 15 Cal.App.4th 70, 79 [18 Cal.Rptr.2d 729] ["[o]rdinarily, the word 'and' connotes a conjunctive meaning, while the word 'or' implies a disjunctive or alternative meaning"].) Thus, the alleged commission of an assault alone, without evidence of a threat to criminal proceedings or participation in them by the victim or witness, would be sufficient for issuance of a section 136.2 restraining order. It was this potential unmooring of section 136.2 protective orders from their purpose to safeguard the criminal justice system and its participants that was addressed in *Stone, supra*, 123 Cal.App.4th 153 and *People v. Ponce, supra*, 173 Cal.App.4th 378. In both cases (*Ponce* largely by quoting the relevant analysis from *Stone*) the court held issuance of a criminal protective order required evidence of an attempt to unlawfully interfere with criminal proceedings by force or threats to dissuade victims or witnesses from proceeding with the prosecution of the defendant: A single assault (even an aggravated assault as charged here), standing alone, is not enough. (See *Stone*, at pp. 160–161; *Ponce*, at p. 384; cf. *Russell v. Douvan* (2003) 112 Cal.App.4th 399, 401–402 [5 Cal.Rptr.3d 137] [notwithstanding literal language of Code Civ. Proc., § 527.6, single incident of unlawful violence is insufficient basis for civil harassment restraining order; "[a]n injunction is authorized only when it appears that wrongful acts are likely to recur"].)

Although *Stone* did not involve charges of domestic violence, the court's limitation on the grounds for a criminal protective order appeared broad enough to preclude issuance of restraining orders in domestic violence cases in criminal court based on past abuse even when the evidence would be sufficient in a civil proceeding. (See, e.g., *Nakamura v. Parker* (2007) 156 Cal.App.4th 327, 334 [67 Cal.Rptr.3d 286] ["trial court is vested with discretion to issue a protective order under the DVPA [(Domestic Violence Prevention Act)] simply on the basis of an affidavit showing past abuse"; "provisions of the DVPA confer a discretion designed to be exercised liberally, at least more liberally than a trial court's discretion to restrain civil harassment generally"].) As discussed, to forestall that undesirable result, in 2008 the Legislature added subdivision (h) to section 136.2, which provides, in a case in which a crime of domestic violence is charged, the court may consider, in determining whether good cause exists to issue an emergency

protective order pursuant to section 136.2, subdivision (a)(1), "the underlying nature of the offense charged" and the defendant's history of domestic violence, prior restraining orders and other forms of violence or weapons offenses.

The 2008 amendment to section 136.2 necessarily has two related facets. First, it rejected any limitation on the scope of criminal protective orders in domestic violence cases otherwise suggested by language in *Stone, supra*, 123 Cal.App.4th 153. The separate—and greater—protection afforded victims of domestic violence is fully consistent with the Legislature's consistent and repeated efforts to ensure the courts utilize all available tools, including section 136.2, to safeguard victims of domestic abuse. (See, e.g., Stats. 2001, ch. 698, § 1, p. 5476 ["The Legislature recognizes that both criminal courts and civil courts may issue protective orders or restraining orders to prevent domestic violence. Orders issued by the criminal court also serve to protect the safety of a victim or a witness in a criminal proceeding."].) Evidence of past harm to the victim of domestic violence may constitute good cause for issuance of a criminal protective order.

■ Equally important, however, in expressly responding to *Stone* by authorizing use of the underlying nature of the offense charged to determine whether good cause exists to issue a restraining order in domestic violence cases, but not otherwise disapproving *Stone*'s holding that a criminal protective order requires evidence of a threat to the criminal proceedings or participation in them by the victim or witness, the Legislature must be presumed to have acquiesced in that construction of section 136.2: "It is a well-established principle of statutory construction that when the Legislature amends a statute without altering portions of the provision that have previously been judicially construed, the Legislature is presumed to have been aware of and to have acquiesced in the previous judicial construction." (*Marina Point, Ltd. v. Wolfson* (1982) 30 Cal.3d. 721, 734 [180 Cal.Rptr. 496, 640 P.2d 115]; accord, *People v. Harrison* (1989) 48 Cal.3d 321, 329 [256 Cal.Rptr. 401, 768 P.2d 1078] [Legislature "is deemed to be aware of statutes and judicial decisions already in existence, and to have enacted or amended a statute in light thereof"].) Here, of course, we need not presume the Legislature knew of *Stone*'s interpretation of section 136.2 when it added subdivision (h) to the statute in 2008. As quoted above, the legislative documents establish the Legislature was fully aware of the decision and disagreed with it only to the extent it narrowed the authority of the criminal court to protect victims of domestic violence. The Legislature's acquiescence in the *Stone* court's construction of section 136.2 in cases not involving domestic violence, therefore, is binding on us.

■ In sum, in domestic violence cases past harm, as evidenced by the underlying charges or other information concerning the defendant's criminal

history, or threat of future harm to the victim may provide good cause for issuance of a criminal protective order. In all other cases, a criminal protective order must be based on a finding of good cause to believe an attempt to intimidate or dissuade a victim or witness has occurred or is reasonably likely to occur. That finding may be based on the underlying charges and the circumstances surrounding the commission of the charged offenses, but a mere finding of past harm to the victim or a witness is not sufficient.

### 4. *The Superior Court Erred in Issuing the Criminal Protective Order*

The superior court issued a criminal protective order prohibiting any contact by Babalola with Godfrey and Jones based solely on a summary of testimony at the preliminary hearing regarding the charged assaults and the proximity of Babalola's and his alleged victims' residences. This information did not constitute good cause under section 136.2: This is not a domestic violence case, and there was no evidence Babalola had attempted to intimidate or dissuade his victims from reporting the crime. Indeed, according to Jones, Babalola himself had called the police, and officers arrived at the scene of the incident shortly after it occurred. Similarly, there was no evidence Babalola had attempted to intimidate or dissuade his victims from testifying at trial or that there was any reasonable likelihood that intimidation or dissuasion or any other type of harm to Jones and Godfrey would occur in the future.

Although not expressly referred to by the superior court in its brief explanation for issuing the criminal protective order, there was testimony at the preliminary hearing indicating the victims harbored racial animus toward Babalola either because he is African-American or because of his interracial relationship with Brooks. That potential for "bad blood" between the participants in the assault, as the prosecutor described it, and the proximity of their residences do suggest further conflict may be possible. But that evidence falls far short of establishing a reasonable likelihood Babalola will attempt to intimidate or dissuade Godfrey and Jones from testifying at trial or otherwise cause them additional harm. To the contrary, as evidenced by Brooks's testimony she had previously obtained a restraining order against the alleged victims, notwithstanding the hostility, Babalola and Brooks appear to have demonstrated their ability to deal with their neighbors in a lawful and appropriate manner.

### 5. *The Superior Court Erred in Failing to Give Babalola Adequate Notice and an Opportunity to Present Evidence*

In light of the superior court's decision to vacate the criminal protective order entered against Babalola following our issuance of the alternative writ,

we decline to consider in detail Babalola's arguments concerning the alleged procedural irregularities that preceded entry of that order. Nonetheless, a few general observations are necessary. First, section 136.2, subdivision (a)(1), expressly authorizes ex parte criminal protective orders in domestic violence cases and we have no doubt such emergency orders are proper in cases involving violent crimes in other contexts as well, provided there is an adequate showing of the need for a temporary order and the court thereafter schedules a hearing to consider whether the order should continue for the duration of the criminal case. (See § 136.2, subd. (a)(5); cf. Code Civ. Proc., § 527.6, subd. (c) [authorizing temporary restraining order without notice to defendant in civil harassment cases, including assault, battery or stalking].) Here, however, the alleged crimes took place on November 1, 2009; Babalola was charged in February 2010; and he appeared at pretrial proceedings in March, April and May 2010. No application for a protective order was made at those pretrial hearings, and no evidence was presented that any emergency existed in late June 2010 when the prosecutor finally submitted the request. Babalola was entitled at minimum to some notice that the request was going to be made so he could prepare for the hearing. (See *Cleveland Board of Education v. Loudermill* (1985) 470 U.S. 532, 546 [84 L.Ed.2d 494, 105 S.Ct. 1487] ["[t]he essential requirements of due process . . . are notice and an opportunity to respond"]; *In re Large* (2007) 41 Cal.4th 538, 552 [61 Cal.Rptr.3d 2, 160 P.3d 662] ["[t]he very purpose of giving the parties notice and the opportunity to be heard is to give them a chance to present information that may affect the decision"].)

Second, testimony from the defendant's preliminary hearing concerning the circumstances surrounding the charged offenses, whether or not sufficient for issuance of a criminal protective order by itself, will inevitably be relevant to the determination of good cause under section 136.2, subdivision (a). That testimony may include hearsay not otherwise admissible at trial. (See § 872, subd. (b); *Whitman v. Superior Court* (1991) 54 Cal.3d 1063, 1072 [2 Cal.Rptr.2d 160, 820 P.2d 262].) We leave to another day the question whether such hearsay testimony may be considered by the court in deciding the question of good cause for issuance of a criminal protective order. (But see § 136.2, subd. (h) [authorizing court in cases involving charges of domestic violence to consider information from enumerated electronic databases regarding defendant's history].) However, if evidence from the preliminary hearing is to be presented to the court considering issuance of a criminal protective order, the transcript of the hearing itself, not a summary of the testimony by counsel who was not present, should be provided to the court. (Cf. *Whitman*, at pp. 1072–1073 [officer at preliminary hearing may not simply read police report prepared by absent investigating officer].)

## DISPOSITION

The petition is dismissed.

Woods, J., and Zelon, J., concurred.